SPRINGFIELD MARINE BANK, Trustee, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 12749;

Fourth District—April 17, 1975.

*Rehearing denied May 19, 1975.*

Brown, Hay, & Stephens, of Springfield (Harvey B. Stephens and John H. Squires, of counsel), for petitioner.

William J. Scott, Attorney General, of Springfield (Larry R. Eaton and Anthony B. Cameron, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE GREEN delivered the opinion of the court:

Petitioner, Springfield Marine Bank, is the trustee of an Illinois land trust, known as the Westchester Trust or Westchester, the beneficial interest of which is in a joint venture. The venture involves the purchase of real estate, its platting and development for residential purposes, and the sale of the improved lots. It does not build on the lots. In 1962, Westchester purchased a tract of land, and by 1972, 15 subdivisions had been developed on it. That year plans were made for a 16th subdivision. Westchester was unable to obtain from the Environmental Protection Agency (E.P.A.) a permit to connect its sanitary drainage outlet to a sewer. That agency had placed a ban on further connections in this area, which was in the southwest part of the city of Springfield. A variance from that ban was denied by the Pollution Control Board (P.C.B.) and petitioner appeals.

The evidence indicated that for several years, in time of heavy rain, a substantial amount of storm drainage water had entered the sanitary sewers causing overflows of raw sewage in manholes and basements in the southwest Springfield area. Most of the area where this occurred was serviced by a sanitary sewer which joins downstream, the one to which petitioners sought to connect. On May 12, 1972, E.P.A. first denied petitioner's application to connect on the grounds that insufficient information had been furnished by petitioner. On July 12, 1972, E.P.A. placed the ban on the issuance of further connection permits to developers in the general area.

Both the Springfield Sanitary District and the E.P.A. had hoped that the flooding condition would be eliminated when the new Sugar Creek treatment plant of the district went into operation. None of the area in question would send sewage to this plant, but it would service part of the area then serviced by the main plant, thus relieving pressure on the

main plant. The sewage from the area in question would continue to go to the main plant.

Much of the controversy centers on a letter dated August 29, 1972, from William V. Pye, of the E.P.A., to A. Paul Troemper, Executive Director of the Springfield Sanitary District. After making various observations about overflow problems in the district the letter concluded:

"Based on our evaluation of the past and proposed accomplishments and our own inspections, this Agency has determined that it will be able to issue a limited number of "conditional installation" sewer permits in the drainage area of the Outer Park sanitary sewer. These permits will allow connection of new sewers to the system when the new treatment plant is completed and in operation. Continued issuance of conditional installation permits will be contingent on the results of the above program and, most importantly, the absence of further overflows from the sanitary sewers in this area. In the event further overflows are observed, this Agency will discontinue issuance of conditional installation permits."

This letter soon came to the attention of Charles J. Johnson, manager of the Westchester venture. Thereafter, on September 14, 1972, a conditional installation permit was issued to Westchester authorizing it to install sanitary sewers but not to connect them to existing sewers. As a special condition of the permit Westchester was required to stop its sewers at least 10 feet from any proposed connection point. Stated on the permit was the following:

"Special Condition #2: No connections may be made to this sanitary sewer extension without a Permit for the connection from this Agency.

\* \* \*

Special Condition #4: Issuance of this Permit must not be construed as termination of the sanitary sewer extension critical review status, imposed by our letter of July 12, 1972, which remains in effect."

Petitioner introduced evidence that upon the basis of the letter and the conditional permit, the principals of the venture assumed that they would be permitted to connect the sanitary drains when the new treatment plant was in operation. They then procured a loan from the Springfield Marine Bank for slightly over a million dollars. They spent about ⅔ of the proceeds procuring other land to develop and committed approximately ⅓ of the proceeds to the development of the 16th addition to Westchester. An officer of the bank testified that he would not have authorized the loan had he not also believed, relying on the letter and

conditional permit, that Westchester would get a connection permit when the new plant went into operation.

The new plant went into operation during August, 1973. On the 8th of that month, Westchester petitioned the E.P.A. for a permit to connect and use its sewage drains. The request was denied on October 26, 1973. On April 1, 1974, the instant petition for variance was filed.

Petitioner contends that the P.C.B. is estopped to deny a permit, that the P.C.B. acted arbitrarily and unreasonably in denying the permit, that the ruling was contrary to the manifest weight of the evidence, and that the denial discriminated against petitioner in violation of the due process and equal protection clauses of the State and Federal constitutions.

■■ P.C.B. did not find the hardship on Westchester incurred because of a denial of the variance to be great. Its opinion noted that the entire Westchester venture had received taxable income of $213,721 in 1972 and $94,183 in 1973 and that a $10,000 loss was projected for 1974. The opinion considered that the income was not lost but merely postponed. We believe that the P.C.B. gave insufficient consideration to the hardship of petitioner. To have a third of a million dollars tied up in a development project that is delayed by even one year is a substantial hardship, particularly in a time of high interest costs.

■■ Petitioner contends that the delay in the Westchester project prevented it from proceeding with its plans to develop the other land with the other ⅔ of the proceeds of the loan. P.C.B. was correct in disregarding this contention. The causal connection claimed was too remote. P.C.B. was also correct in rejecting petitioner's claim of estoppel.

In *Wachta v. Pollution Control Board*, 8 Ill.App.3d 436, 289 N.E.2d 484, an appeal was also taken from a P.C.B. decision denying a "hardship variance" sought by land developers. There the petitioners had obtained an unconditional sanitary connection permit from the State Sanitary Water Board (predecessors to P.C.B. and E.P.A.) and had expended substantial funds in reliance on the permit when P.C.B. issued a general order prohibiting all connections to the sanitary outlet which the sewage would enter. In reversing the order denying the variance, the court cited *Hickey v. Illinois Central R.R. Co.*, 35 Ill.2d 427, 220 N.E.2d 415, for the doctrine that the State can be estopped under "extraordinary circumstances." In applying this rule to the case it was considering, it stated:

> "Here, the State of Illinois, through its Sanitary Water Board, did the positive act of issuing sewer permits to Petitioners which induced them to continue their construction project. They, in reliance upon the action of the Water Board, expended substantial

sums of money and incurred heavy continuing liabilities which would be lost should the State now be permitted to retract what its officials had done." 8 Ill.App.3d 436, 440, 289 N.E.2d 484, 487.

■■ Among the necessary requirements for an estoppel on traditional equitable grounds are "conduct ＊ ＊ ＊ amounting to a representation or concealment of material facts" (3 Pomeroy, Treatise on Equity Jurisprudence (5th ed. 1941), § 805); *Dinet v. Eilert*, 13 Ill.App. 99, 100).

In the instant case, the conduct of the agencies of the State is in no way similar to that in *Wachta*, and nothing that they did would give rise to estoppel on traditional grounds. In *Wachta* an unconditional permit was issued prior to the improvements being made by the owners. Here, the letter in question was not directed to petitioner. Even if it be assumed that officials of petitioner would be expected to see it, they could consider it at most as a statement of present intention couched in terms of warning that conditions might change. Petitioner had no reason to assume that it would be among those getting one of the "limited number of 'conditional installation' sewer permits" which would allow connection when the new treatment plant went into operation. The conditional permit said nothing about allowing connection as soon as the new plant went into operation and was also couched in cautionary language in special conditions 2 and 4. No unconditional permit was ever issued.

Petitioner complains that E.P.A. wrote a letter dated March 15, 1973, to the Springfield Sanitary District telling them that E.P.A. had decided to continue the ban on connections after the new plant went into operation and did not send a copy of the letter to the developers. The letter of August 29, 1972, had been sent only to the sanitary district officials, and E.P.A. had no way of knowing who had become advised of that letter. They had no obligation to send the March 15, 1973, letter to Westchester. The detriment to petitioner incurred in proceeding with this project is substantial but the developers did incur it at their own risk and not upon justifiable reliance upon any conduct of a State official amounting to a representation or concealment of a material fact. At no time did they "retract" permission previously granted.

The board's opinion stated that they denied the variance request "because the economic hardship to the land trust, not the hardship to the individual beneficiary owners, does not outweigh the harm to the public and the environment caused by the continued sewer overflows and basement backups." Petitioner maintains that this finding is contrary to the manifest weight of the evidence. We have indicated earlier that we believe that the hardship to petitioner, although much of it was

self-inflicted, is more substantial than the board believed. The amount of the hardship is, however, difficult to calculate.

Even harder to appraise is the amount of damage that would be suffered by the public if Westchester were allowed to connect. The evidence of sewer backups and basement overflows in times of heavy rains is sufficient to support a finding that substantial damage was occurring from some source. Gerald L. Peters, district engineer for the sanitary district, testified that in his opinion the plant that would treat the sewage had adequate capacity. William K. Busch, a sanitary engineer employed by the E.P.A., on the other hand, testified that in his opinion increase in the flow of the sewer into which Westchester sewage would go would aggravate the backup in the sewer where the flooding was occurring even though the joinder of the sewers was downstream from the area of the flooding. Leonard K. Crawford, a consulting engineer to the Springfield Sanitary District, testified that he estimated that the flow from Westchester would represent 0.6% of the flow downstream from the junction of the two sewers in question. This was the only evidence presented as to the amount of increase in the flow.

The evidence is thus undisputed that the amount of aggravation to the overflow problem that would result from allowance of this one variance would be very small. If this variance were granted, however, other developers similarly situated would also have to be granted variances. In *La Salle National Bank v. City of Chicago*, 6 Ill.2d 22, 31, 126 N.E.2d 643, 647, in discussing the problem of drawing boundary lines for zoning areas, the court stated, "As often noted, zoning lines must begin and end somewhere and the decision of each case must depend on its particular facts." Here, too, lines must be drawn somewhere even though each successive increase in the load in a sewer may have minimal effect. Considering this factor and considering that if the P.C.B. granted a variance of this nature they could not later retract it, we rule that the finding that the damage to the public would be greater than the hardship to the petitioner is not contrary to the manifest weight of the evidence.

■■ Petitioner complains that the opinion makes no reference to some of its favorable evidence to show that this evidence was considered. No such requirement exists. It also complains that the board gave its decision on June 28, 1974, which was the same day that the major portion of the record was presented to the board. We do not presume any irregularity in this. The case under consideration is unlike *Dorfman v. Gerber*, 29 Ill.2d 191, 193 N.E.2d 770, cited by petitioner, where an administrative agency had suspended an insurance broker and agent's license where the respondent had technically failed to transmit ½ of 1% of his premiums

to his insurer within the required 90-day period. That ruling was held to be capricious and arbitrary.

Lastly, petitioner contends that the denial of a variance to it while other similarly situated developers were given variances to connect to sanitary facilities denied it due process and equal protection. Two of such developments are located in the Pinebrook subdivision. One is known as Westbrook Apartments. The record is silent as to whether they have a variance or how or when they were permitted to connect their sanitary drains. The other is an apartment project for the elderly. The third development is one by the Viking Corporation. Here the developers put in a retaining tank that could hold back sewage in times of heavy rainfall. In addition, the buildings on it were complete prior to the ban.

■■ The discrimination of which complaint is made is not that which is invidious per se. The different treatment given by the State agency is, therefore, valid if there is a reasonable basis for the classification. (*Village of Cahokia v. Wright*, 11 Ill.App.3d 124, 296 N.E.2d 30, *aff'd*, 57 Ill.2d 166, 311 N.E.2d 153; *McGowan v. Maryland*, 366 U.S. 420, 6 L.Ed.2d 393, 81 S.Ct. 1101.) Such a reasonable basis was clearly shown here.

For the reasons stated, the ruling of the Pollution Control Board denying the variance is affirmed.

Affirmed.

SIMKINS, P. J., and TRAPP, J., concur.