PPG INDUSTRIES, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District   No. 13837

Opinion filed July 25, 1977.

Jon D. Robinson, of Hull, Campbell & Robinson, of Decatur, and George P. Cheney, Jr., and Paul M. King, both of PPG Industries, Inc., of Pittsburgh, Pennsylvania, for petitioner.

William J. Scott, Attorney General, of Springfield (Russell R. Eggert and Patrick J. Chesley, Assistant Attorneys General, of counsel), for respondents.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

PPG Industries, Inc. (PPG) petitions for review of an order of the Illinois Pollution Control Board (Board) denying its petition for a variance from the suspended solids requirement of Rule 408(a) of the Illinois Pollution Control Board Rules and Regulations, chapter 3: Water Pollution.

On review PPG contends that the findings in the opinion and order of the Board are contrary to the manifest weight of the evidence, erroneous as a matter of law, and insufficiently specific.

The parties have stipulated that PPG owns and operates a glass manufacturing plant at Mt. Zion, Illinois. In 1957, PPG built Lake Pittsburgh, a 2.5-acre cooling pond, on its property at the Mt. Zion plant. Lake Pittsburgh was not constructed by the damming of any surface streams and there are no natural water-courses entering it. The sources of water for the pond consist of water softener backwash and noncontact cooling water discharged from the glass plant, subsurface field tiles from adjacent properties, and storm run-off. The field drainage and storm water flow are necessary to provide Lake Pittsburgh with sufficient water

to function as a cooling pond. The pond has an outlet into a tributary of Lake Decatur.

On January 3, 1975, the United States Environmental Protection Agency issued a National Pollutant Discharge Elimination System (NPDES) permit for the discharge of water at the Mt. Zion plant. The permit was granted subject to certain conditions, including a requirement that the concentration of suspended solids at the outlet of Lake Pittsburgh (designated as Outfall 001) was not to exceed 15 milligrams per liter (mg/1)—the maximum concentration of suspended solids allowed to be discharged from a water treatment works under the Illinois standard set forth in Rule 408(a).

Tests conducted by the Illinois Environmental Protection Agency (Agency) indicate that the concentration of suspended solids in the water at the outlet of Lake Pittsburgh fluctuates considerably and frequently has been far in excess of the 15 mg/1 standard. Tests conducted by PPG, however, indicate that the concentration of suspended solids in the water discharged into Lake Pittsburgh from the glass plant has been consistently well within the standard. The parties agree that the excessive concentration of suspended solids in the water leaving Lake Pittsburgh is attributable not to any discharge from the plant but to "the effects of storm action, animal action and fish action stirring up sediment within the pond."

On February 26, 1975, PPG filed a petition with the Agency pursuant to sections 35—38 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, pars. 1035—1038) alleging arbitrary and unreasonable hardship and seeking a permanent variance from the Illinois suspended solids standard. The petition sought either to increase the amount of suspended solids allowed at the outlet of Lake Pittsburgh or to change the monitoring site from the outlet of Lake Pittsburgh to the point of discharge from the glass plant into Lake Pittsburgh. The petition was forwarded to the Board for decision, and at PPG's request a hearing was held.

As part of the stipulation of facts, PPG submitted two alternatives by which compliance with the 15 mg/1 standard could be achieved. One alternative would be to install a clarifier to treat the suspended solids at an estimated cost of $615,000 (excluding maintenance and operating costs). The other alternative would be to eliminate the cooling pond, install a cooling tower, and incinerate the water softener backwash. The cost of implementing this alternative is estimated to be $150,000 (excluding maintenance and operating costs).

In denying the variance the Board concluded its opinion with the following statement:

"The Board recognizes that there is no apparent relationship between suspended solids discharged at outfall 001 and the suspended solids contained in the influent to Lake Pittsburgh. However, because Lake Pittsburgh is a treatment facility, PPG has a greater responsibility to maintain it in an environmentally sound condition. PPG has not proven that achieving compliance with Rule 408(a) would impose an arbitrary and unreasonable hardship upon it. Furthermore, although PPG has researched the cost of compliance, it has not submitted a detailed description of a program to be undertaken to achieve compliance. The essence of a variance is a firm and adequate program for achieving compliance. *Metropolitan Sanitary District of Greater Chicago v. EPA*, 3 PCB 57. Therefore, the Board denies PPG's request for variance from Rule 408(a) for outfall 001."

■■ In reviewing the Board's order we first consider PPG's contention that the Board's findings of facts and law were insufficiently specific to support the order. PPG bases this claim on *Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill. 2d 290, 319 N.E.2d 794. *Incinerator*, however, involved an enforcement proceeding rather than a petition for variance as is involved in the instant case. In an enforcement action, the Board is required by section 33(c) of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1033) to consider certain specifically listed criteria. In *Incinerator* the Supreme Court affirmed a Board order even though the order had not made specific findings on each of the criteria listed in section 33(c) but warned the Board to make such specific findings in the future. However, no specific criteria are required to be considered in variance proceedings; section 35 of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1035) provides that the determination of whether to grant or deny a variance is to be based on a consideration of whether compliance with the contested pollution standard "would impose an arbitrary or unreasonable hardship." In the instant case, the Board's opinion included findings stating the facts and reasons leading to its conclusion that compliance with the suspended solids standard would not impose such a hardship on PPG. These findings meet the requirement of section 35 that opinions in variance proceedings state the facts and reasons leading to the Board's decision, and we deem them sufficiently specific.

■■■ PPG also contends that the Board erred in finding that the filing of a detailed program for eventually achieving compliance with the contested standard is a prerequisite for the granting of a variance. We consider this finding irrelevant to the instant appeal. PPG sought a permanent variance, the purpose of which was to be excused from ever having to comply with the suspended solids standard. If a permanent

variance had been granted, a compliance plan would have served no purpose. Compliance plans are useful only in connection with temporary variances, which are granted to allow for gradual compliance where immediate compliance would impose a hardship. We note, however, that since the instant case was decided by the Board, the Supreme Court has stated that the concept of a permanent variance from a statewide standard for the discharge of contaminants is inconsistent with the purposes of the Environmental Protection Act and should rarely be granted (*Monsanto Co. v. Pollution Control Board* (No. 48748, March 1977), ___ Ill. 2d ___, ___, ___ N.E.2d ___, ___, slip opinion at 4-5).

PPG's main contention, however, is that the Board erred in its findings that "because Lake Pittsburgh is a treatment facility, PPG has a greater responsibility to maintain it in an environmentally sound condition" and that therefore meeting the suspended solids standard at the outlet of Lake Pittsburgh did not impose an arbitrary or unreasonable hardship on PPG. While PPG argues, among other things, that the finding is not supported by the evidence, the sufficiency of the evidence is not really at issue. It is undisputed, and the Board found, that Lake Pittsburgh is a "treatment works" and that the excessive concentration of suspended solids at the outlet of Lake Pittsburgh is attributable to nonplant sources such as storm runoff, field drainage from adjacent properties, and animal action in the pond. What *is* at issue is the reasonableness of holding PPG responsible for suspended solids entering the pond from nonplant sources.

PPG argues that it should not be required to clean up excessive discharges not caused by it, citing Rules 401(b) and 402 of chapter 3 and *Citizens for a Better Environment v. Proctor & Gamble Manufacturing Co.* (1973), 8 Ill. P.C.B. #Op. 473. Although, as the Agency points out, Rules 401(a) and 402 were not specifically referred to by PPG in the proceedings before the Board, the issue of fairness to which they relate was the chief matter raised by PPG in asking the Board to grant a variance.

Rule 402 prohibits effluents, "alone or in combination with other sources," from violating water quality standards. "Effluent" is defined by Rule 104 of chapter 3 as including "any wastewater discharged, directly or indirectly, to the waters of the State or to any storm sewer, and the runoff from land used for the disposition of wastewater or sludges, but does not otherwise include non-point source discharges such as runoff from land or any livestock management facility * * *." Rule 402 is not of much help to PPG, however, since, because Lake Pittsburgh is a "treatment works" as defined by Rule 104, all of the water leaving it is considered "wastewater" and therefore is defined as an "effluent."

Rule 401(b) provides in part that

"it is not the intent of these regulations to require users to clean up

contamination caused essentially by upstream sources or to require treatment when only traces of contaminants are added to the background. Compliance with the numerical effluent standards is therefore not required when effluent concentrations in excess of the standards result entirely from influent contaminations, evaporation, and/or the incidental addition of traces of materials not utilized or produced in the activity that is the source of the waste."

*Proctor & Gamble* involved an enforcement action brought against a plant for the discharge of suspended solids and lead in excess of standards. The water was taken from the Chicago River, used only for noncontact cooling in Proctor & Gamble's plant, and discharged back into the river. The Board concluded that the excess concentrations resulted from upstream contamination and found no violation, quoting the statement of Rule 401(b) that "it is not the intent of these regulations to require users to clean up contamination caused essentially by upstream sources."

■■ A different situation is presented in the instant case. The record here indicates that at least a substantial portion of the suspended solids entering Lake Decatur from the outlet of Lake Pittsburgh would not find its way into Lake Decatur but for the existence of Lake Pittsburgh and the actions of nature upon the impounded water. The only purpose of Lake Pittsburgh is to serve as a cooling pond for PPG's plant; there are no other users. Since PPG is solely responsible for the presence of the pond, it is not unreasonable to hold PPG responsible for the quality of the water leaving the pond and entering the waters of the State.

For the reasons stated above, the order of the Pollution Control Board is affirmed.

Affirmed.

REARDON and KASSERMAN, JJ., concur.