ARMOUR-DIAL, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District   No. 77-378

Opinion filed May 11, 1978.

Joseph S. Wright, Jr., and Dixie L. Laswell, both of Rooks, Pitts, Fullagar & Poust, of Chicago, for petitioner.

William J. Scott, Attorney General, of Chicago, and Deborah Senn, of Maywood (George William Wolff, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE GUILD delivered the opinion of the court:

On February 1, 1977, Armour-Dial filed a petition for variance with the Illinois Pollution Control Board (hereinafter the Board.) The petition sought a variance from section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1009(a)) (hereinafter the Act) which prohibits air pollution and discharges in violation of the Board's rules. The petition also sought a variance from Rules 205(f) and 103(b)(6)(A) of the Board's air pollution regulations, which respectively limit discharge of odor producing organic materials to 8 pounds per hour and bar issuance of operating permits to emission sources which either violate the Act or the rules, or which do not have a variance from the Board. The People of the State of Illinois, represented by the Attorney General, who had previously filed two suits in the circuit court of Kane county, sought and were granted leave to intervene. The Environmental Protection Agency (hereinafter the Agency), recommended that the variance be denied and, following a public hearing, the Board denied the variance on July 7, 1977. Pursuant to section 41 of the act (Ill. Rev. Stat. 1975, ch. 111½, par. 1041), Armour-Dial has petitioned this court for judicial review of the Board's decision.

Armour-Dial first presents arguments concerning the appropriate standard of review to be applied in this case. Armour-Dial also argues that the Board erred: (1) in finding that any hardship suffered by Armour-Dial was self-imposed and that the public harm herein outweighed the hardship imposed upon Armour-Dial; and (2) in denying the variance because of an existing odor problem and possible contribution to a violation of the Federal and State ambient air quality standards and regulations. In addition to answering the arguments raised by Armour-Dial, the respondents (the Board, the Agency and the People) make several additional arguments which may be summarized as follows: (1) the petition should have been denied because of procedural deficiencies; (2) the Board does not have authority to grant variances from the provisions of section 9(a) of the Act; (3) under the circumstances of this case the Federal Clean Air Act, as amended in 1970 and 1977 (42 U.S.C. §4901 *et seq.*) prohibits granting the requested variances; and (4) certain exhibits offered by Armour-Dial are irrelevant and their use was properly limited.

■■ Prior to oral argument in this case both sides filed various motions with this court, most of which we disposed of at the time. We did, however, order taken with the case a motion by Armour-Dial to strike

portions of the respondents' brief. Armour-Dial asks first that we strike the respondents' additional statement of facts because of failure to comply with Supreme Court Rule 341(e)(6) (Ill. Rev. Stat. 1975, ch. 110A, par. 341(e)(6)). We have examined the additional statement of facts and find that, while it is not perfect, it does contain appropriate references to the pages of the record on appeal in most places. In addition, it is not so replete with comment and argument as to render it useless to this court. Armour-Dial further asks that we strike all portions of respondents' brief dealing with the effect of the Federal Clean Air Act amendments. Armour-Dial takes the position that these matters should have been raised by the Agency or the intervenors before the hearing and that the Board should have the first opportunity to interpret or apply the aforementioned statutes. Armour-Dial does not cite, and we are unaware of, any authority which requires the Agency or anyone else to raise any legal arguments prior to the hearing on a variance petition. Indeed, in this particular case, the parties were reminded by the hearing officer on several occasions that they were to present their legal arguments in closing arguments after the hearing. Further, we note that the arguments which Armour-Dial seeks to have stricken, with the exception of the one concerning the 1977 amendments to the Clean Air Act, were made in the closing arguments of the Agency and the intervenor. Thus, Armour-Dial has been well aware of most of these arguments for some time and the Board did have the opportunity to pass upon those particular issues. Although the Board chose not to do so, we do not believe that constitutes a bar to our review of these issues should we deem it necessary to reach them. It is clear to us that the proper interpretation of statutes is a judicial function. We therefore deny Armour-Dial's motion to strike the cited portions of the respondents' brief and pass to the merits of the case before us.

■■ Armour-Dial's first argument concerns the proper standard of review to be applied in this case. They contend that the findings of the Board "must be reversed if they are unsupported by the *manifest weight* of *substantial evidence,* or if they are *arbitrary, capricious, unreasonable or otherwise not in accordance with law.*" In essence, Armour-Dial urges that we apply a series of three separate tests and invalidate the Board's findings if any of the tests is not met. The respondents reply that the manifest weight of the evidence test is the proper standard of review of Board decisions to grant or deny variances. Respondents also point out that the burden of proof rested upon Armour-Dial to convince the Board that a variance should be granted, as well as it being petitioner's burden in this court to demonstrate that the Board's decision was incorrect. On this issue we tend to agree with respondents. In *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684, the supreme court took great pains to delineate which standards of review are applicable to

the various actions taken by the Board. There the supreme court held that in reviewing rule-making proceedings and conditions attached to variances, which are an exercise of the quasi-legislative powers of the Board, the arbitrary and capricious standard is to be used. However, with regard to the grant or denial of a variance itself, the supreme court said:

"This decision is essentially quasi-judicial, and, as such, must be supported by a written opinion with specific findings which are entitled to a presumption that they are *prima facie* true and correct. [Citation.] Nonetheless, if the factual determinations of the Board, or of any administrative agency, are contrary to the manifest weight of the evidence, the reviewing court is empowered to reverse the agency's findings." (67 Ill. 2d 276, 289, 367 N.E.2d 684, 689.)

We therefore will apply the manifest weight of the evidence standard in reviewing the findings of the Board.

In 1964 Armour-Dial opened its plant near Montgomery, Illinois, which manufactures toilet soap from tallow, coconut oil and caustic soda. It has approximately 700 employees. Commencing in 1965 it became apparent that there was an odor problem associated with operation of the Armour-Dial plant. Thereafter it is undisputed that Armour-Dial undertook various activities in an attempt to eliminate or control the odor problem. (*Armour-Dial, Inc. v. Environmental Protection Agency*, 8 Ill. P.C.B. Op. 343 (1973).) As a result of various studies it was eventually determined that organic material released from the oily cooling water tower into the atmosphere was probably the major source of odors emanating from the plant. In 1973 Armour-Dial submitted a plan to the Board to replace the barometric condensers on its fatty acid trains with surface condensers. The plan was based upon Armour-Dial's observations in 1972 that the technique had been successfully used to reduce odors at a soap manufacturing plant in Germany. The initial variance (8 Ill. P.C.B. Op. 343) was allowed to enable Armour-Dial to submit final design plans and schedules for installation of the surface condensers. A further variance to allow installation of the proposed system, estimated to cost $3,900,000 was granted in 10 Ill. P.C.B. Op. 261 (1973). Under the terms of that particular variance the installation of the surface condensers was to be completed by August 31, 1975. Due to the one-year limitation on variances, the variance itself expired in December 1974. Approximately one week after the grant of the second variance, the Board, at the request of Armour-Dial, modified the variance order to allow substitution of a biodegradation program for the previously approved surface condenser program. The substituted program had the twin benefits of a shorter installation time and a substantially reduced cost. Armour-Dial admits that at the time the biodegradation program was approved "all parties

understood that if the experimental program did not succeed Armour-Dial would then proceed to install surface condensers." The evidence adduced herein indicates that Armour-Dial told everyone the time lost if the system failed would be only six months to one year.

The biodegradation system operated on the principle of diverting organically contaminated waters to the Armour-Dial wastewater treatment facility. A substantial portion of the organic materials would be removed in that process and clean water would be returned to the oily cooling water tower. Thus, the amount of organic material reaching the tower would be substantially reduced and organic discharges would likewise be reduced, thus reducing the odor.

Mr. Moffatt, the director of engineering for Armour-Dial, testified that the company did install the system in 1974. Starting with September 1974 and continuing through March 1975, the Aurora Sanitary District, which received the discharges from Armour-Dial's plant, issued a series of citations to Armour-Dial for discharging excess amounts of suspended solids which caused a considerable upset condition within the Sanitary District plant. In April 1975 Armour-Dial discontinued its biodegradation system. Thereafter, in an attempt to utilize the system to at least some extent, they leased sludge dewatering equipment and began to haul biosolids from the plant. At the time of the hearing herein, in May 1977, the biodegradation system, in connection with the sludge dewatering operation, was being used on an intermittent basis.

Following the excess discharge problems to the Aurora Sanitary District, Armour-Dial apparently undertook a program of re-evaluation of the biodegradation system and decided that the wastewater treatment facility would need to be expanded to utilize the system. At a December 1975 meeting of Armour-Dial personnel, it was decided to expand the wastewater treatment facility and to institute other systems within the plant which would reduce the loads reaching the wastewater treatment facility. In January 1976 Armour-Dial commenced to re-evaluate their total environmental control program. In May 1976 the board of directors of the parent corporation approved a new expanded environmental control program which was estimated to cost between $11 and $13 million. The program included not only the original replacement of barometric condensers with surface condensers on the fatty acid trains, but also replaced the condensers in other portions of the chemical process. The existing dust collectors were to be replaced with new, multicycle dust collectors and the wastewater treatment facility was also to be expanded. With regard to the chemical process, which everyone herein apparently believes is the major cause of emissions and odors, nothing but engineering work was scheduled to be done until after August 1977. No actual installation of equipment within the chemical process portion of

the plant was scheduled until January 1978 and the total installation of chemical process equipment would not be completed until November 1979. Armour-Dial's interim reductions in levels of emissions were to be 3.3% in January 1978, 6.1% in July 1978, 40% in November 1978, 65% in June 1979 and 73.3% upon completion of the program. An examination of the proposed project, therefore, reveals that no significant decrease in estimated emission levels would occur until late 1978, approximately halfway through the installation of the new chemical process equipment.

Although Rule 205(f) of the Board's air pollution regulations limits the emission of odor-producing organic materials to 8 pounds per hour, Armour-Dial's own witnesses calculated that the plant emits 16 or 17 pounds per hour. The Agency, in its recommendation, calculated the emissions at approximately 35 pounds per hour and other rates far in excess of that were mentioned. Apparently, however, Armour-Dial is the only one who has ever done any testing to determine the emission rates from their oily cooling water tower or any other sources within their plant.

Considerable evidence was also introduced concerning a study done by Air Resources, Inc., at the request of Armour-Dial, to determine the plant's contribution to odors and ground-level hydrocarbon concentrations in the vicinity. The conclusion of Air Resources was that Armour-Dial did not cause or contribute to the ground-level concentrations of hydrocarbons in the vicinity of the plant but that perhaps such concentrations were the result of automobile emissions and natural sources. The study itself consisted of a section of modeling, during which Air Resources attempted to predict, based upon data made available to it concerning Armour-Dial's emission levels, where the hydrocarbon and odor concentrations from the plant would be the greatest. As a result of the modeling calculations, two sites were selected at which to conduct actual monitoring of hydrocarbon concentrations. Neither site selected was exactly where the predicted level of hydrocarbons would be the highest, apparently due to the need for electrical power and other support facilities for the test equipment. Rule 309 of the Board's air pollution regulations sets an ambient air quality standard for hydrocarbons of 0.24 ppm maximum 3 hour concentration. The actual results of the monitoring indicate that the hydrocarbon levels at both monitoring sites were consistently above 1.0 ppm and in some instances well above 2.0 ppm. When the monitoring data is sorted by wind direction, the concentrations downwind from Armour-Dial are at 1.8 ppm and 1.5 ppm, respectively.

Five citizen witnesses appeared at the hearing and testified to their experiences with odor problems. All witnesses found the odors offensive in various degrees and testified that the odors at times forced people to go

indoors or curtail outdoor activity, such as baseball games or hunting and fishing activities. One witness found the odors nauseating, although no other witnesses testified to actual adverse physical effects from the odors. Some of the witnesses had filed previous complaints with Armour-Dial concerning the odors. In all instances Armour-Dial had treated the people courteously and had corrected several matters but had never been able to eliminate odors. The witnesses were, however, of the opinion that the odors were noticeably less frequently than in the past.

With this information before it, the Board found that harm to the public as the result of Armour-Dial's emissions potentially arises in the form of "continuation of a serious odor nuisance and possible contribution to a violation of the health-related air quality standards for hydrocarbons." The Board also concluded that "considering the long delay in achieving compliance, the hardship to Armour-Dial is at this point self-imposed" and that the hardship to Armour-Dial was outweighed by the harm to the public from Armour-Dial's emissions. The variance request was, therefore, denied.

Armour-Dial first argues that the Board erred in finding that the hardship suffered by Armour-Dial was self-imposed. Armour-Dial takes the position that the oily cooling water tower is an essential part of the plant and that, if it cannot be used, the plant must close. They also contend that the two suits filed in the circuit court of Kane County by the Attorney General seek immediate shutdown of Armour-Dial's facility. Respondents take the position that Armour-Dial failed to prove what hardship would be involved in immediate compliance with the emission standards of Rule 205(f) and further argue that the Attorney General's actions in the circuit court seek only compliance with Rule 205(f) and not immediate shutdown of the Armour-Dial plant. We have examined copies of the pleadings filed in the circuit court actions, which have been made part of the record herein, and they plainly ask that Armour-Dial be ordered to cease and desist from, among other things, emissions in excess of Board regulations, operating its oily cooling water tower without a permit, and any emissions which cause a public nuisance. We find it unnecessary and inappropriate for us to characterize those pleadings any farther. It may well seem to Armour-Dial that the only way in which they could accomplish the results sought by the Attorney General would be to close their facility. Whether in fact that would be necessary, however, was not proven in this record. Although it is clear that the oily cooling water tower is an essential part of the plant, it is not clear whether emissions could be substantially reduced by curtailing production or in some other manner. It is also unclear what reductions, if any, could be accomplished immediately at an increased cost or otherwise. What is clear from the record herein, however, is that Armour-Dial has

undertaken a rather extensive and costly program which the Board, in its opinion, noted was "likely to achieve compliance with the Act and Regulations." The Board did not undertake to state exactly what hardship would be suffered by Armour-Dial if the variance were denied but did state that "denial of a variance is not tantamount to a shutdown order * * * but merely denies Petitioner a shield from prosecution." It may be that the Board was in the same quandary as this court, in that it is apparent that there would be some hardship, inconvenience or expense to Armour-Dial in immediate compliance with the Board's regulations. The exact extent of that particular hardship, however, is not determinable upon the present record.

Armour-Dial argues that it is in the same position as the plaintiff in *Caterpillar Tractor Co. v. Pollution Control Board* (1977), 48 Ill. App. 3d 655, 363 N.E.2d 419. In that case the Board also commented that a denial of a variance was not tantamount to a shutdown order. In that particular case, however, there was uncontradicted testimony that the only alternatives available to Caterpillar were to obtain a variance, to operate the furnaces without a permit in violation of law, or to shut down. Although it may be inferred that the easiest way for Armour-Dial to obtain compliance in this case is to shut down, as we noted earlier there is no evidence which requires us to reach that conclusion. Likewise in this case, it is apparent to us that Armour-Dial, for whatever reason, chose to operate their facility, apparently in violation of law, after their previous variance expired in December 1974. They made no attempt whatsoever to apply for a new variance until February 1977. It is therefore apparent to us, as it undoubtedly was to the Board, that operating the Armour-Dial plant without a permit, and without a variance, is something the company is more than willing to take the risk of doing. Our conclusion in this regard is reinforced by the fact that at least one of the Attorney General's suits against Armour-Dial has been on file since December 2, 1975, and even that did not prompt Armour-Dial to undertake any immediate activities before the Board to protect itself from possible penalties due to noncompliance with environmental laws. While it is true that at all times herein Armour-Dial has apparently kept the Agency informed of its pollution control activities, this information is in no way equivalent to possessing a valid operating permit or variance. Even after May 1976 when Armour-Dial received authority from the board of directors of the parent corporation to undertake the environmental control program, they made no attempt to apply for a variance until shortly after the Attorney General instituted his second suit in the circuit court. In our opinion these facts make this case very different from that which was before the Third District in *Caterpillar Tractor Co.*

■■ Inasmuch as the hardship suffered by Armour-Dial was of

undetermined extent, Armour-Dial clearly failed to prove that such hardship was "arbitrary or unreasonable" as required by section 35 of the Act. The Board was, therefore, correct in its ultimate decision to deny the variance. Because the Board chose not to rest its decision on those grounds, however, we proceed to examine the Board's actual findings to see if they are supported by the manifest weight of the evidence.

The first such finding is that the unspecified hardship suffered by Armour-Dial was self-imposed. Armour-Dial argues that its case presents a situation analogous to *Woodruff & Edwards, Inc. v. Environmental Protection Agency* (1976), 24 Ill. P.C.B. Op. 193, in which the Board did grant a variance. It is true that in both our case and *Woodruff* the Board had previously authorized the petitioner to pursue an experimental control program which ultimately failed. The cases are also alike in that both contemplated that an entirely different type of system would be installed if the experimental system failed, the main difference apparently being that Woodruff was under a Board order in the previous variance case which required it to install the other system in the event of failure. Among the differences between this case and *Woodruff* is that although numerous citizens objected in *Woodruff*, none appeared at the hearing to testify in opposition to the grant of the variance as they did in this case. In addition, *Woodruff* did not involve an odor problem inasmuch as the contaminant involved was carbon monoxide. It is also to be noted that *Woodruff* involved a relatively short time period in which to install the required equipment and the variance was granted only until the date upon which the previously approved substitute control equipment would be installed, which was early in a more extensive compliance program. That is clearly not the case before us inasmuch as the surface condensers which the original program contemplated were not to be installed by Armour-Dial until sometime well into 1978 or 1979 under the proposed new plan. We believe the facts of the two cases are sufficiently different to justify the Board treating the two cases differently.

A considerable amount of the evidence and arguments allegedly going to the issue of self-imposed hardship is directed to the merits of the biodegradation plan and whether or not the Board should have approved it. At one point the respondents even argue that the only reason the Board did approve the plan was because Armour-Dial had perpetrated a species of fraud upon it. In our view this is not the time or place to litigate the merits of that particular system. The benefit of hindsight now tells us that the system was unworkable under the conditions existing at Armour-Dial's facility. Although it might have been advantageous to examine that possibility more fully at the time the Board approved the plan, the fact of the matter is that it was not done. In our opinion the decision in this case must be predicated upon what occurred after the approval of the

biodegradation plan. Although the Board had before it all of the information going to the merits of the biodegradation plan as we have before us, we believe that it properly limited its considerations to an examination of Armour-Dial's activities following the grant of the variance for the biodegradation system. We have set out the chronology of those activities and will not repeat them. Based upon that evidence the Board concluded that "Armour-Dial learned by November, 1974, if not sooner, that the biodegradation system was not feasible because of the upset conditions it caused in the Aurora Sanitary District's treatment plant." Although we have examined the record in this case very carefully, we are unable to determine upon what evidence the Board based this conclusion. It is clear that Armour-Dial had received several citations from the sanitary district prior to November 1974. It is clear to us that by November of 1974 Armour-Dial should certainly have been in the process of examining their system to see what was wrong and what, if anything, could be done to improve things. It does not follow, however, that Armour-Dial was required to conclude at that point that the system was not feasible. Based on the record herein we are forced to conclude that Armour-Dial did determine that the biodegradation system was not feasible in April 1975, when the system was shut down.

Although the Board's finding that Armour-Dial knew the system was not feasible in November 1974 is contrary to the manifest weight of the evidence, it does not necessarily follow that all the Board's conclusions are likewise contrary to the manifest weight of the evidence. Starting with the April 1975 date, it should still have been apparent to Armour-Dial that they did not possess a valid variance. They should also have been aware of the fact that they had previously promised all parties concerned, including the Board, that if the biodegradation program failed they would lose only a year at most in achieving compliance. Thus, in April 1975 Armour-Dial should clearly have realized that their promises obligated them to reinstitute the surface condensers to achieve compliance by August 1976, which was one year later than the original compliance date under the variance to install surface condensers. Despite these facts, apparently all that Armour-Dial did for the entire remainder of 1975 was to try to salvage, to some extent, the biodegradation system. While those efforts were probably worthy of undertaking, that does not mean that Armour-Dial was entitled to disregard its promises and obligations with regard to a surface condenser program. So far as we can tell nothing was done with regard to reinstituting that program until January 1976. Even then the program was merely returned to the very preliminary planning stages. Under the terms of the first variance granted to Armour-Dial for the surface condenser program, a substantial amount of engineering should have been done in 1973. Nevertheless, in its new

program Armour-Dial provided for well over a year devoted entirely to engineering on its chemical processes. While we note that the new program did entail surface condensers in other areas than those originally contemplated, it does not automatically follow that another year was necessary to engineer such proposals. If that were the case it was incumbent upon Armour-Dial to introduce evidence which would support such a conclusion. We find none in the record before us. We are therefore forced to conclude, as did the Board, that Armour-Dial has made no showing of why it took so long to reinstitute their surface condenser program or why it will take until almost the end of 1979 to complete its program. Thus we are in substantial agreement with the Board concerning the facts which support their conclusion that the hardship which Armour-Dial now faces is self-imposed. While the time periods which we have considered are somewhat shorter than those apparently relied upon by the Board, it is apparent to us that there are substantial periods of delay for which Armour-Dial has not provided an adequate explanation. The Board's findings in that regard are not contrary to the manifest weight of the evidence.

Armour-Dial's second contention is that the Board erred in finding that the public harm outweighed the hardship to Armour-Dial. As we have previously noted, however, the exact hardship which Armour-Dial suffers is not well delineated in this record. We deal first with the Board's finding that there is a significant odor nuisance. Armour-Dial does not argue that there is not an odor problem but contends, similar to its first argument, that it has acted diligently in its attempt to control and eliminate the problem. They also argue that the Board perhaps failed to consider the interim reductions in emissions during the course of the program. Inasmuch as the Board referred to these reductions we do not believe they failed to consider them. It was undoubtedly evident to the Board, as it is to us, that there would be no significant reduction in the level of emissions, and possibly the odor, until late 1978 or early 1979. Under such circumstances it is not surprising that the alleged interim reductions in emissions were not sufficient to persuade the Board that the public would not continue to suffer significant odor problems for a substantial length of time. We find the Board's conclusion that there was a significant odor problem in the area is fully supported by the evidence.

We turn now to the Board's finding that Armour-Dial possibly contributes to a violation of the ambient air standards for hydrocarbons. From the actual on-site monitoring data of the Air Resources study, it is readily apparent that there is a gross violation of ambient air quality standards in the area of the Armour-Dial plant. This is true regardless of the direction from which the wind blows. Oddly enough, it is to be noted that the levels consistently appear somewhat lower when the wind is

blowing from the direction of Armour-Dial. While it is perhaps true that Armour-Dial contributes less to the apparent violation than other sources, that does not mean that the Board's finding of a possible contribution is against the manifest weight of the evidence. Upon this issue Armour-Dial also seeks to rely upon *Caterpillar Tractor Co. v. Pollution Control Board.* In that case the Board's denial of a variance was stated to be for two reasons, one of which was Caterpillar's failure to prove that emissions do not contribute to a violation of the ambient air quality standards and the second of which was alleged failure to show an arbitrary and unreasonable hardship existed, the only reason given by the Board in that case for denying the variance was the ambient air quality standards. That is clearly different from the case herein where, in addition to violation of the ambient air quality standards, there is a serious odor problem. It is also to be noted that in *Caterpillar* the court concluded there was no question of the company's good faith. That is clearly different than the case before us in which that was a hotly contested issue which the Board resolved against Armour-Dial. We have already concluded that that decision was not against the manifest weight of the evidence. Therefore, *Caterpillar* is not dispositive of the issue herein, which is whether possible violations of ambient air quality standards in conjunction with a serious long-continued odor problem, are sufficient to deny a variance when, although some hardship was proved, the extent thereof was uncertain.

■■ It is apparent to us, therefore, that the Board's findings and decision are not contrary to the manifest weight of the evidence. In view of this conclusion it is not necessary for us to reach any of the respondents' arguments concerning procedural deficiencies or lack of authority to grant the requested variances. The decision of the Pollution Control Board is affirmed.

Affirmed.

SEIDENFELD, P. J., and BOYLE, J., concur.