WILLOWBROOK DEVELOPMENT CORPORATION, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District    No. 80-585

Opinion filed January 27, 1981.

Timothy J. Ryan, Walter J. O'Brien, and Richard M. Guerard, all of O'Brien & Guerard, of Oakbrook Terrace, for petitioner.

Tyrone C. Fahner, Attorney General, of Chicago (William E. Blakney, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE REINHARD delivered the opinion of the court:

This case involves an appeal pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1041) from an order of the Illinois Pollution Control Board (Board) entered on July 3, 1980. Section 41 of the Act provides, in pertinent part, that "any person who has been denied a variance * * * may obtain judicial review * * * directly in the Appellate Court for the District in which the cause of action arose and not in the Circuit Court" (Ill. Rev. Stat. 1979, ch. 111½, par. 1041). The appellant, and petitioner below, Willowbrook Development Corporation (Willowbrook), had requested a variance from the Board to connect and operate a sewer extension to serve 152 units of the developer's planned Lake Willow Way development in Willowbrook, Illinois. The Board, however, in its order, granted the requested variance for only 52 of the units at Lake Willow Way. Willowbrook is seeking a reversal of that portion of the order which failed to grant a variance for the remaining 100 units planned for Lake Willow Way.

The facts involved are set out in detail since they are dispositive of this case. Willowbrook is the developer of Lake Willow Way, which is projected to comprise 38 multifamily structures and a total of 152 coach-house units. The project is located in Du Page County, Illinois, and occupies a 17.5-acre parcel containing a 4.5-acre man-made lake. In March 1976, Willowbrook's engineers requested a preliminary opinion and evaluation of the proposed sewer system from the Illinois Environmental Protection Agency (EPA). The EPA responded by letter dated March 23, 1976, indicating that, according to their records, the Du Page County Marionbrook Sewage Treatment Plant (Marionbrook) had adequate

capacity to accept the additional flow from the planned project (then planned as an apartment complex) and, therefore, had no objection to the proposed sewer system. The EPA did point out, however, that the Board's Rules and Regulations require that a permit be obtained prior to the installation of the sewer system.

Approximately three years later, in March 1979, Willowbrook submitted to the EPA an application for a permit to construct and operate a sanitary sewer extension for Lake Willow Way. The EPA responded by letter dated April 13, 1979, that they must deny the permit since they lack the "statutory authority to permit sewer extensions when the receiving sewers or treatment plants are already overloaded," referring to the Marionbrook treatment plant. The EPA further pointed out, however, that where the following two conditions are satisfied, they are able to issue special permits for construction only and not operation: (1) The owner of the overloaded facility has received a permit from the EPA to install additional or upgraded facilities which will have sufficient capacity to handle the load anticipated from the sewer extension under consideration, and (2) all contracts necessary for the completion of the construction of the additional facilities have been signed and ratified by the responsible authorities. Those two conditions were satisfied in approximately July 1979.

On September 17, 1979, Willowbrook submitted an application to the EPA for the above-described "Construct Only Permit" and the permit was issued by the EPA on September 26, 1979. Construction began at Lake Willow Way in the first week of December 1979. The terms of both the application and the permit itself provided that the permit was for construction only and did not authorize actual operation of the facilities. The terms of each provided that operation of the facilities constructed would be contingent upon the issuance of an "Operating Permit" by the EPA. EPA Technical Policy WPC—5 provides that "[t]he issuance of a Construct Only Permit to the applicant is a method for allowing the construction of a sanitary sewer which, due to projected sewerage facilities' improvements, can become operational at a time consistent with completion of sewerage facilities improvements."

On April 30, 1979, some five months prior to issuing the Construct Only Permit to Willowbrook, the EPA notified the Du Page County Department of Public Works (DCDPW) that it was placing their Marionbrook plant on "Restricted Status" because it was operating at 102 percent of its EPA rated capacity. Restricted Status is defined in EPA Technical Policy WPC—4 as "the Agency determination * * * that a sewer has reached hydraulic capacity or that a sewage treatment plant has reached design capacity, such that additional sewer connection permits may no longer be issued without causing a violation of the Act or Regulations."

EPA Technical Policy WPC—4 further provides that notification of Restricted Status shall be sent to the owner of the treatment facility (in this case DCDPW) and that a list of the plants subject to Restricted Status shall be published and made available upon request as well as published in the Pollution Control Board's publication, Environmental Register, which was done by the EPA.

Subsequent to receiving the Construct Only Permit, Willowbrook had little or no contact with the EPA and was not informed that the Marionbrook plant was on Restricted Status. Willowbrook agents communicated frequently with DCDPW employees regarding the status of the improvements at the Marionbrook facility and were informed repeatedly that improvements were underway to increase plant capacity from 4 MGD (million gallons per day) to 5 MGD, which would enable them to accommodate flows from Lake Willow Way and that upon completion of the plant modifications, operating permits could be obtained from the EPA. The village of Willowbrook issued building permits in December 1979, and construction began shortly thereafter. Despite the frequent communications between Willowbrook and DCDPW, DCDPW never informed Willowbrook that the Marionbrook plant was on Restricted Status. Willowbrook first learned of the Restricted Status classification in April 1980, in conversation with an EPA employee. On April 4, 1980, Willowbrook filed a petition for variance with the Board pursuant to section 37 of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1037) seeking permission to connect a sewer extension to serve the 152 units projected for Lake Willow Way. The EPA filed a written recommendation that the petition for variance be denied. The variance hearing was held on June 20 and June 21, 1980. At the conclusion of testimony, the Board entered an opinion and order granting a variance for only 52 of the 152 units planned for Lake Willow Way.

At the Board hearing, Mr. Donald Schuster, president of Willowbrook Development Corporation, testified that the Corporation had already expended approximately $1,100,000 in land and site improvements, $2,000,000 in building construction and $150,000 in general and administrative expenses; that Willowbrook had undertaken extensive land clearing and excavation, installed sewer and water mains for the entire development, had done some paving and had eight buildings (32 units) at various stages of completion. Schuster testified that the denial of a variance for Lake Willow Way would result in the bankruptcy of himself personally and the Willowbrook Development Corporation.

A representative of Brookfield Federal Savings and Loan Association testified that they had outstanding loans to Willowbrook in the amount of $3,111,000 which represented more than 55 percent of the net worth of Brookfield Federal and that default by Willowbrook would have serious

effects on their financial stability. The mayor of the village of Willowbrook indicated that there would be serious problems with police and fire protection if the project were abandoned, as well as a negative impact on tax revenues for the village. The marketing agent for Lake Willow Way indicated that there were 26 signed sales contracts for units at Lake Willow Way which were in jeopardy. Finally, the Director of DCDPW testified that in his opinion the Marionbrook plant had the capacity to accept the projected flow from the Lake Willow Way project.

The EPA presented various witnesses who testified regarding the condition of the Marionbrook plant and its capacity to handle the additional flow anticipated from Lake Willow Way. The EPA witnesses testified that a Construct Only Permit was issued to Willowbrook because although the Marionbrook plant was overloaded, a project was underway to increase the capacity of the plant from 4 MGD to 5 MGD; that when an expansion program is underway at a plant the EPA will issue Construct Only Permits up to the capacity expected to be available when repairs are completed; that shortly after issuing Willowbrook a Construct Only Permit in September 1979, the EPA became aware of a "deteriorating condition" at Marionbrook involving mechanical and personnel problems resulting in hydraulic overloading and inadequate treatment of flows; that the EPA would not have issued a Construct Only Permit to Willowbrook on September 26, 1979, had it known of these mechanical difficulties sooner; that the Marionbrook plant is unable to treat adequately the flows it currently receives and that further environmental damage would result if Willowbrook is granted a variance.

Three issues are presented in this appeal:

(1) Whether the Board should be estopped from denying the variance for the balance of Willowbrook's planned units;

(2) Whether the decision of the Board granting variances for only 52 units of the 152 units requested constitutes a denial of due process or is against the manifest weight of the evidence;

(3) Whether the Board has complied with section 35 of the Environmental Protection Act which requires the Board to file and publish a written opinion stating the facts and reasons leading to its decision when granting or denying a variance.

■■ The first argument which Willowbrook advances in this appeal is that the doctrine of equitable estoppel should be applied to prevent the Board from denying variances for the remaining 100 units planned for Lake Willow Way. Equitable estoppel has been defined as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights which might otherwise have existed as against another party who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse. (*Slavis v. Slavis* (1973), 12 Ill. App. 3d

467, 299 N.E.2d 413.) Six elements must be presented for the doctrine of equitable estoppel to be applicable:

"(1) Words or conduct by the party against whom the estoppel is alleged constituting either a misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom the estoppel is alleged that representations made were untrue; (3) the party claiming the benefit of an estoppel must have not known the representations to be false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting the estoppel; (5) the party seeking the benefit of the estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of the estoppel must be in a position of prejudice if the party against whom the estoppel is alleged is permitted to deny the truth of the representations made." *Stewart v. O'Bryan* (1977), 50 Ill. App. 3d 108, 110, 365 N.E.2d 1019, 1020-21.

In support of its equitable estoppel argument, Willowbrook cites this court's decision in *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 289 N.E.2d 484. In *Wachta*, an appeal was taken from an order of the Board denying a hardship variance to land developers. There the developers had actually obtained a permit to install and operate sewer lines for their subdivision from the State Sanitary Water Board, the predecessor of the Pollution Control Board and EPA. After receiving the permit, the developers installed the sewer system and expended substantial sums of money toward development of the subdivision. Nearly a year after granting the permit, the Board entered a general order which prohibited all further sewer connections to the facility which the developers planned to utilize. The developers then sought a hardship variance pursuant to section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1035). The Board entered orders permitting sewer connections for eight houses which were completed or partially completed, while denying variances for the remaining 19 lots in the subdivision. On appeal, this court reversed, holding that the doctrine of equitable estoppel was applicable:

"Here, the State of Illinois, through its Sanitary Water Board, did the positive act of issuing sewer permits to Petitioners which induced them to continue their construction project. They, in reliance upon the action of the Water Board, expended substantial sums of money and incurred heavy continuing liabilities which would be lost should the State now be permitted to retract what its officials had done." 8 Ill. App. 3d 436, 440, 289 N.E.2d 484, 487.

While there are superficial similarities between this case and *Wachta*,

the differences are significant, and controlling. In *Wachta*, the developers were issued a permit to install and operate sewer lines, whereas in this case Willowbrook received a Construct Only Permit. Furthermore, while in *Wachta* the Board did the "positive act" of issuing unconditional sewer permits which the developers relied upon to their detriment, in this case there was no similar action by the Board which Willowbrook could have justifiably relied upon. Both the permit application and the permit itself clearly indicated that the permit was for construction only, not operation. In short, this is not a situation where the Board has attempted "to retract what its officials had done." *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 440, 289 N.E.2d 484, 487.

More relevant is *Springfield Marine Bank v. Pollution Control Board* (1975), 27 Ill. App. 3d 582, 327 N.E.2d 486, in which the court rejected the developers' argument of equitable estoppel and affirmed the Board's denial of a variance. In that case, the developers argued that they had acted in reliance on a letter from the EPA to the Director of the Springfield Sanitary District indicating that the EPA would be able to issue a limited number of "conditional installation" sewer permits and would allow connection of new sewers when a certain new treatment plant was completed and in operation. The developers thereafter applied for and obtained a "conditional installation permit" and began work on their planned subdivision. When the new plant went into operation, the developers applied for a permit to connect and use its sewers, which was denied by the EPA. The developers then petitioned for a variance, which the Board denied. In affirming the Board, the court distinguished *Wachta* by pointing out that there the developers had received an unconditional permit prior to making any improvements. The court concluded that the detriment incurred by the developers was at their own risk and was not in "justifiable reliance upon any conduct of a State official amounting to a representation or concealment of a material fact." 27 Ill. App. 3d 582, 586, 327 N.E.2d 486, 490.

Also, in *Springfield Marine Bank v. Pollution Control Board* (1975), 27 Ill. App. 3d 964, 327 N.E.2d 492, a connected case, the court again rejected an argument of equitable estoppel and affirmed the Board's denial of a variance for the operation of a sanitary sewer. The developers there argued that the Board should have been estopped from denying the variance because of the letter mentioned in the foregoing case and because of the previous issuance of a conditional ("Construct Only") permit. The court held that neither of those actions would give rise to a claim of equitable estoppel and that the implicit finding of the Board, that the damage to the public if the variance were granted would exceed the hardship to the developer if it were denied, was not against the manifest weight of the evidence.

■■ We conclude that the doctrine of equitable estoppel is inapplicable in this case since Willowbrook failed to establish words or conduct of the EPA constituting either a misrepresentation or concealment of material facts. The only representations of any kind made by the EPA were those in the Construct Only Permit which were explicit in cautioning Willowbrook that such a permit was for construction only and that "[o]peration of the facilities will be totally contingent upon the issuance of an operating permit by the agency ° ° °." While there were representations made by DCDPW, the owner of the sewage treatment plant, to Willowbrook, that they would be able to obtain an operating permit from the EPA as soon as certain plant improvements were made, these do not warrant application of the equitable estoppel doctrine to the EPA since the EPA had no role in making such representations. An estoppel only extends to and operates between parties and their privies. (*Dill v. Widman* (1952), 413 Ill. 448, 109 N.E.2d 765; *Greer v. Carter Oil Co.* (1940), 373 Ill. 168, 25 N.E.2d 805.) Therefore, we conclude that the EPA was not guilty of misrepresentation in dealing with Willowbrook and that any misrepresentation by DCDPW is not attributable to the EPA.

■■ Furthermore, although an estoppel may arise from silence as well as words, silence will not create an estoppel unless there is a positive duty to speak. (*Town & Country Bank v. James M. Canfield Contracting Co.* (1977), 55 Ill. App. 3d 91, 370 N.E.2d 630.) We are unaware of any provision in either the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1001 *et seq.*) or the EPA's rules which imposes an affirmative duty on the EPA to keep Construct Only Permit holders apprised of the status of improvements at a given treatment facility. Absent such a duty, the EPA's silence concerning the deteriorating condition at Marionbrook cannot form the basis for an estoppel. Finally, Willowbrook's dilemma is at least partially attributable to its failure to maintain contact with the EPA subsequent to obtaining its Construct Only Permit. "A party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." *Vail v. Northwestern Mutual Life Insurance Co.* (1901), 192 Ill. 567, 570, 61 N.E. 651.

Willowbrook's second argument is that the decision of the Board is against the manifest weight of the evidence. The Board and EPA argue, on the other hand, that the appropriate standard of review is whether the Board's action was arbitrary, unreasonable or capricious, but that even under the manifest weight of the evidence test, the Board's action was proper.

It is clear that the Board's decision to grant or deny a variance is a quasi-judicial decision that is reviewed under the manifest weight of the evidence test, while the attaching of conditions to a variance is a policy or

rule-making function of the Board reviewable under the arbitrary and capricious standard. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684; *Armour-Dial, Inc. v. Pollution Control Board* (1978), 60 Ill. App. 3d 64, 376 N.E.2d 411.) While the Board and EPA argue that in granting variances for only 52 of the 152 planned units they have attached a limiting condition reviewable under the more stringent arbitrary and capricious standard, that position appears to us to be untenable.

■■ The Board has acted unconditionally in granting a variance for 52 units at Lake Willow Way, while unconditionally denying a variance for the remaining 100 units. The mere fact that the Board has granted a partial variance does not give rise to a "condition on a variance" within the meaning of section 36 of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1036). Therefore, the Board's decision to deny a variance for 100 of the units planned for Lake Willow Way must be viewed as a quasi-judicial decision reviewable under the manifest weight of the evidence test.

Although Willowbrook and other parties stand to suffer hardship if the Board's decision is upheld, we nevertheless are unable to conclude from a review of the record that the decision of the Board is against the manifest weight of the evidence. Section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1035) provides that the Board may grant a variance when "compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship." After reviewing the testimony of the EPA and Willowbrook, the Board balanced the likely hardship to Willowbrook if the variance were denied against the likely hardship to the public if the variance were granted. The Board concluded that denial of a variance for the 52 units expected to be completed in 1980 would result in an unreasonable hardship but that the findings did not justify a grant of a variance for all 152 proposed units "at this time." The Board further concluded that granting a variance for only those 52 units would "allow time for the Agency and the Board to determine the likely future of the Marionbrook Plant while Willowbrook continues construction in a limited manner."

■■ Deference is due the factual determinations of the Board since it is charged with primary responsibility in adjudicating in the specialized area of environmental disputes (*Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 215 N.E.2d 286), and we view those findings as *prima facie* true and correct (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684). For such findings of an administrative agency to be against the manifest weight of the evidence, it must appear that opposite conclusions are clearly evident. *Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 391 N.E.2d 190; *Wegmann v.*

*Department of Registration & Education* (1978), 61 Ill. App. 3d 352, 377 N.E.2d 1297.

From a review of the record, we are unable to conclude that the Board erred in balancing the hardships and granting a partial variance to Willowbrook. There was considerable testimony to the effect that the Marionbrook plant is overloaded and incapable of adequately treating the flow it currently receives, much less any additional flow from the Lake Willow Way Development. There was also testimony regarding mechanical failures at the plant and personnel related problems, the combined effect of which was a poor quality effluent. Stream surveys indicated that Saw Mill Creek, which receives the Marionbrook discharge, was semipolluted to polluted. While the additional flow expected from Lake Willow Way may appear small in relation to the total flow handled by the Marionbrook plant, "lines must be drawn somewhere even though each successive increase in the load in a sewer may have minimal effect" (*Springfield Marine Bank v. Pollution Control Board* (1975), 27 Ill. App. 3d 582, 587, 327 N.E.2d 486, 491). We cannot say that the Board's decision to draw the line at 52 units for the time being is contrary to the manifest weight of the evidence.

Finally, Willowbrook argues that it was denied its right to due process because of the Board's alleged failure to state the facts and reasons for its decision as required by section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1035). Section 35 provides that "[i]n granting or denying a variance the Board shall file and publish a written opinion stating the facts and reasons leading to its decision." The Board published and filed a three page written opinion and order setting forth the pertinent facts and the rationale for their decision. While additional specificity is always possible, we are satisfied that the opinion meets the statutory requirements and in no way impairs Willowbrook's right to due process. See *PPG Industries, Inc. v. Pollution Control Board* (1977), 50 Ill. App. 3d 888, 365 N.E.2d 1325.

Accordingly, the order of the Pollution Control Board granting a variance for 52 units and denying a variance at this time for the remaining 100 units is affirmed.

Affirmed.

UNVERZAGT and LINDBERG, JJ., concur.