(No. 48748.—

MONSANTO COMPANY, Appellee, v. THE POLLUTION CONTROL BOARD *et al.*, Appellants.

*Opinion filed June 1, 1977.—Rehearing denied Oct. 3, 1977.*

278

William J. Scott, Attorney General, of Springfield (Russell R. Eggert, Assistant Attorney General, of Springfield, and George Wm. Wolff and James N. Cahan, Assistant Attorneys General, of Chicago), for appellants.

Richard J. Kissel and Thomas H. Donohoe, of Martin, Craig, Chester & Sonnenschein, of Chicago, for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

The Monsanto Company, appellee, petitioned the Pollution Control Board (hereinafter Board) for a permanent variance from the provisions of Illinois Water Pollution Regulation 702(a), dealing with mercury discharges to public sewer systems. The Board granted Monsanto a one-year variance with certain conditions limiting the amount of mercury which could be permissibly discharged. Monsanto appealed the Board's order, contending that those conditions were not supported by the evidence and that the Board was in error in concluding that it could not grant a permanent variance. The appellate court agreed, one judge dissenting, and reversed the Board's decision. (39 Ill. App. 3d. 333.) We granted the Board and the

Illinois Environmental Protection Agency leave to appeal.

Monsanto owns and operates the William G. Krummrich Chemical Plant in Sauget, Illinois. The Krummrich plant produces more than 70 different chemical products. More than 80% of these products have as essential ingredients either chlorine, sodium hydroxide, potassium hydroxide, or hydrogen. These four products are made by a production unit known as the "chlor-alkali facility." The chlor-alkali facility uses mercury as a conductor of electricity. All effluent streams from the chlor-alkali facility are collected and passed through a mercury-treatment system prior to discharge. Nonetheless, some mercury from the chlor-alkali facility is discharged into the Sauget sewer system, which ultimately empties into the Mississippi River. In addition, small amounts of mercury are also present in the waste water discharged from other areas of the plant.

Illinois Water Pollution Regulation 702(a) provides that no effluent to any public sewer system shall contain mercury in excess of .5 parts of mercury per billion parts of water at any time. In November of 1971 Monsanto was granted a variance from the statewide standard, conditioned on it limiting all its mercury discharge to .5 pounds per day. In October of 1972 another variance was granted, this time with limits of .33 pounds per day based on a six-month moving average, and .5 pounds per day in any 24-hour period. A third variance was granted to Monsanto in November of 1973. This variance limited discharge to .25 pounds per day based on a six-month moving average, but not to exceed .4 pounds per day in any 24-hour period.

In August 1974, Monsanto petitioned for a fourth 12-month variance. Hearings were held, and in March 1975, following the hearings but before the Board ruled, Monsanto filed an amended variance petition requesting a permanent variance instead of the 12-month variance it

had originally requested. On April 24, 1975, the Board ruled that it had no authority in cases such as this to grant a variance in excess of one year, and entered an order granting the one-year variance which is the subject of this appeal, retroactive to November 6, 1974, expiring November 5, 1975. The Board imposed as conditions of this variance that Monsanto limit its mercury discharge to .2 pounds per day based on a six-month moving average, with the discharge for any 24-hour period not to exceed .3 pounds. These limits are approximately five and eight times, respectively, in excess of the statewide requirement of Regulation 702(a).

The Appellate Court for the Fifth District concluded that the Board erred in ruling that it could only grant a variance for one year, and held that the conditions imposed by the Board in granting the instant variance were against the manifest weight of the evidence. There are, then, three issues which we must address in deciding this appeal. First, does the Pollution Control Board have the authority, under the Illinois Environmental Protection Act, to grant variances in excess of one year? Secondly, was the appellate court correct in using the manifest weight of the evidence standard to evaluate the conditions imposed by the Board? Finally, using the proper standard of review, was there sufficient evidence to support the Board's imposition of the interim standards limiting Monsanto's mercury discharge during the period of the variance?

Variances are governed by sections 35 through 38 of the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, pars. 1035 through 1038). Section 35 provides that the Board may grant variances whenever it finds, upon presentation of adequate proof by a petitioner, that any rule, regulation, requirement, or order of the Board would impose an arbitrary or unreasonable hardship on petitioner. At the time of the instant variance proceeding,

section 36 (Ill. Rev. Stat. 1973, ch. 111½, par. 1036) read, in pertinent part, as follows:

"(a) In granting a variance the Board may impose such conditions as the policies of this Act may require. If the hardship complained of consists solely of the need for a reasonable delay in which to correct a violation of this Act or of the Board regulations, the Board shall condition the grant of such variance upon the posting of sufficient performance bond or other security to assure the completion of the work covered by the variance. \*\*\*

(b) Any variance granted *pursuant to the provisions of this section* shall be granted for such period of time, not exceeding one year, except for variances for discharges for which a permit is required under Section 39(b) of the Act, which variances shall be granted for such period of time not exceeding five years, as shall be specified by the Board at the time of the grant of such variance, and upon the condition that the person who receives such variance shall make such periodic progress reports as the Board shall specify. Such variance may be extended from year to year by affirmative action of the Board, but only if satisfactory progress has been shown." (Emphasis added.)

Monsanto argues that this section does not prohibit the Board from granting permanent variances in cases like the one at bar because the one-year limitation of section 36(b) applies only to variances granted when petitioner needs a reasonable delay in which to correct a violation. This is so, says Monsanto, because only these delay variances are granted *pursuant to* section 36, as required by section 36(b); all other variances, including the one requested by Monsanto, are pursuant to section 35, and so are not subject to the one-year limitation of section 36(b). We disagree. A close reading of the Act indicates that all variances, including delay variances, are granted pursuant to section 35, the general enabling section of title IX of the Act. Section 36(a) merely gives the Board authority to attach conditions to a variance of any kind and requires that delay variances be conditioned upon the posting of ·

security; it does not, as section 35 does, bestow upon the Board authority to grant any type of variance.

Since no variances are granted pursuant to section 36, paragraph (b) of that section, if read literally, is without meaning, because its application is seemingly limited to variances granted pursuant to the "provisions of this section." The Board argues, and we agree, that section 36(b) cannot be read literally because the inclusion of the word "section" was a drafting error. The one-year limitation was meant to apply to variances granted pursuant to the provisions of title IX, which includes section 35, the enabling section. The word "section," however, was erroneously inserted in place of "title" when title IX was adopted from section 11 of the Illinois Air Pollution Control Act (Ill. Rev. Stat. 1969, ch. 111½, par. 240.11). Section 11(a) of that act was substantially equivalent to section 35 of the present Environmental Protection Act. Sections 11(b) and 11(c) were likewise the predecessors, respectively, of sections 36(a) and 36(b). Thus, the reference in paragraph (c) of section 11 of the former act to variances granted pursuant to this *section* alluded to the authority granted in paragraph (a) of the same section. When these provisions were copied in drafting the present act, however, the authority to grant variances was not placed in the same section. The draftsmen, unfortunately, neglected to change the word "section" to reflect the difference in the section numbering of the two acts. It is clear, then, that the Board was correct in concluding that its power to grant variances under section 35 was circumscribed by the one-year limitation of section 36(b).

We might add, further, that the concept of a variance which permanently liberates a polluter from the dictates of a board regulation is wholly inconsistent with the purposes of the Environmental Protection Act. With regard to water pollution, the Act states:

"It is the purpose of this Title to restore, maintain

and enhance the purity of the waters of this State in order to protect health, welfare, property, and the quality of life, and to assure that no contaminants are discharged into the waters of the State *** without being given the degree of treatment or control necessary to prevent pollution, or without being made subject to such conditions as are required to achieve and maintain compliance with State and federal law ***." (Ill. Rev. Stat. 1975, ch. 111½, par. 1011(b).)

Compliance by all polluters with board regulations is an ultimate goal. The variance provisions afford some flexibility in regulating the speed of compliance, but a total exemption from the statute would free a polluter from the task of developing more effective pollution-prevention technology and would impair the ability of the Board to protect health, welfare, property, and the quality of life. Obviously, this would be inconsistent with the Act's objectives. The Act's emphasis on public health indicates that this objective is to be sought regardless of the hardship which the task of eventual compliance presents an individual polluter. (See Currie, *Enforcement Under the Illinois Pollution Law,* 70 Nw. U.L. Rev. 389, 415 (1976).) Monsanto suggests that the public health could be protected if the Board granted open-ended variances which could be reassessed when the Board became aware of new technology. This type of variance procedure, however, would not impel the development of such technology as does the present system of temporary variances. Moreover, Monsanto's recommendation for intermittent reassessment of indefinite variances has no statutory foundation. Though it may be the procedure most desirable to Monsanto, it is not representative of the statutory scheme actually conceived by the legislature. As indicated above, that scheme contemplates temporary variances. The inconvenience inherent in the necessity to seek a variance annually has been considerably abated, however, by legislative action subsequent to the hearing on Monsanto's

petition. The time limit of section 36(b) has now been increased to five years for all types of variances. Ill. Rev. Stat. 1975, ch. 111½, par. 1036(b).

Monsanto's final argument in support of the concept of a permanent variance is that the Pollution Control Board itself has provided precedent for the concept by granting such a variance on two separate occasions. In *Haight v. Environmental Protection Agency* (1971), 2 Ill. P.C.B. Op. 63, and again in *Dupre v. Environmental Protection Agency* (1970), 2 Ill. P.C.B. Op. 200, it is argued, the Board granted a variance from a previous order which banned additional sewer connections to a community sewer line in the North Shore Sanitary District. The Board did not place any limitation on the duration of the new sewer connections. Nonetheless, those decisions are not authority for the granting of permanent variances from board regulations. The two sewer-connection variances were in the nature of modifications of an earlier board order, which modifications were made only after the Board determined that the additional sewage contemplated would not overburden the local system. No on-going hazard was there present, and so periodic reappraisal was not logically necessary. This, of course, is different from the concept of permanent variance from a board regulation. In such a case, the Board is concerned with the continuing discharge of contaminants at levels exceeding statewide standards. The Board can provide relief from the hardship of immediate compliance and yet retain control over a polluter's future conduct by granting a temporary variance. In no way do the cases of *Haight* and *Dupre,* which are not addressed to future behavior, depart from this legislative scheme.

The next issue presented by this appeal is whether the appellate court applied the proper standard of review in judging the interim discharge levels which the Board set for Monsanto. The appellate court held that the limits

imposed by the Board were contrary to the manifest weight of the evidence. The Board argues that the conditions it attached to the variance should not have been overturned unless they were arbitrary or capricious.

In *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, this court reviewed certain noise pollution regulations of the Board, and upheld them because they were not clearly arbitrary, unreasonable, or capricious. In dealing with those board regulations we said "that administrative action taken under statutory authority will not be set aside unless it has been clearly arbitrary, unreasonable or capricious." (59 Ill. 2d 305, 310.) We see no reason to depart from this holding when dealing with individual interim discharge standards set by the Board, rather than with statewide regulations.

Section 35 of the Environmental Protection Act gives the Board authority to decide if a regulation imposes an arbitrary or unreasonable hardship on an individual polluter. If the Board finds such hardship, it may then grant a variance. This decision is essentially quasi-judicial, and, as such, must be supported by a written opinion with specific findings which are entitled to a presumption that they are *prima facie* true and correct (Ill. Rev. Stat. 1975, ch. 110, par. 274). Nonetheless, if the factual determinations of the Board, or of any administrative agency, are contrary to the manifest weight of the evidence, the reviewing court is empowered to reverse the agency's findings. *Kerr v. Police Board* (1974), 59 Ill. 2d 140; *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469.

Monsanto urges us to adopt this same standard of review for the evaluation of the conditions the Board may attach to variances. In so arguing, Monsanto ignores one controlling factor: interim discharge standards, like statewide regulations, are not in any way analogous to findings of fact. Section 36(a) provides that the Board, in granting a variance, may impose such conditions "as the policies of

this Act may require." The setting of conditions, unlike the decision to grant a variance, is not quasi-judicial in nature, but rather is one manifestation of the power granted the Board to act as the policy-making body. Section 36 of the Act is a rather broad delegation to the Board of power to impose whatever conditions are necessary to effectuate as nearly as possible the policies of the Act when a variance from statewide standards is granted. It is, in a word, rule-making power, in the sense that its focus is on future conduct and its efficacy depends upon agency expertise. "Judicial judgment should not be substituted for administrative judgment on questions within the agency's statutory power of rule making." (Davis, Administrative Law sec. 30.10, at 247 (1958).) The Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance that public threat against an alleged individual hardship and reach a conclusion as to what limits should be placed upon a temporary variance. The power granted to the Board by section 36 is tantamount to the quasi-legislative power to make prospective regulations and orders. (See *Illinois Central R.R. Co. v. Franklin County* (1944), 387 Ill. 301.) When a regulation is promulgated by an agency pursuant to a grant of legislative power, a reviewing court should not substitute its judgment as to the content of the regulation, because the legislature has placed the power to create such regulations in the agency and not in the court. (Davis, Administrative Law sec. 5.03 (1958).) Since in setting interim discharge standards the Board is, in effect, making future policy pursuant to the legislative delegation of section 36(a), we must be just as circumspect about interfering with the Board's discretion in establishing variance conditions as we are in dealing with the enactment of regulations. In summary, then, the proper scope of review of conditions limiting a variance is the same as that applied to board regulations in *Illinois*

*Coal Operators Association*: whether the Board's action was arbitrary, unreasonable, or capricious. See Currie, *Rulemaking Under the Illinois Pollution Law,* 42 U. Chi. L. Rev. 457, 479 (1975).

We must now answer the question whether the conditions of the variance granted Monsanto met this test. To do so we must consider the evidence of public hazard and individual hardship, because the balance struck by the Board between these two countervailing forces prompted the limits in question.

Mercury is an element so toxic that ingestion of small quantities can be lethal. From 1953 to 1960, 121 people in Minamata, Japan, were either killed or severely and permanently disabled by eating fish which had been contaminated with a mercury compound. The source of this mercury was a chemical plant which discharged waste mercury into Minamata Bay. Further, mercury is not biodegradable, so even an innocuous amount of discharge may accumulate over a period of time at a particular location until it reaches a dangerous toxic level. In 1971, the Illinois Pollution Control Board acted to forestall any future mercury-contamination problem by setting discharge and water quality standards sufficiently stringent to preclude all discharges but those which are essentially unavoidable. It is these standards from which Monsanto has been granted four consecutive variances.

Monsanto claims that the conditions attached to the latest variance are not supportable because they set discharge limits with which Monsanto cannot comply. The Board considered Monsanto's evidence on this point, the record of mercury discharge from January 1974 through January 1975, and found that the opposite was true. The Board concluded that Monsanto could meet the conditions imposed because in five separate months during that period Monsanto's monthly average was below the .2-pounds-per-day limit set by the Board. Monsanto,

however, argues that a more accurate reflection of its inability to comply with a .2-pounds-per-day six-month moving average is the fact that although it has held discharge below the .2 level in individual months it has never done so over a six-month period. This court does not possess the expertise necessary to predict the ability of Monsanto to decrease mercury discharge below its best six-month effort. We believe the wisest course is to defer to the Board's judgment that the evidence of five individual months below .2 indicates that Monsanto has the capability to achieve six-month averages below .2. In any case, we need not determine whether Monsanto or the Board has devised the better method for predicting future six-month capability. The controlling fact is that we cannot say that the setting of the .2 figure was arbitrary or capricious in the sense that it was arrived at without deliberation or foundation. The figure quite clearly could have been reached after due consideration of the discharge figures from January 1974 through January 1975, and so we will not disturb the conditions imposed by the Board. We note that in each of the four variances stricter variance conditions have been imposed and Monsanto has been able to regularly reduce its discharge levels.

Moreover, Monsanto's emphasis on its alleged inability to comply is misplaced. In granting or denying a variance, and in setting interim standards once a variance is granted, the Board must balance individual hardship against environmental impact. Inability to comply with a State standard does not make mandatory the granting of a variance. Likewise, inability to limit discharge to the level prescribed by a condition of a variance does not require the Board to change that level. It is well within the power of the Board, in safeguarding the public health, to determine what is the maximum pollution tolerable from any one source, and to refuse to permit deviations from that maximum even when faced with protestations of

impossibility. A concomitant of this absolute power is the commonly exercised prerogative of the Board to promulgate "technology forcing" standards. That is, to hasten ultimate compliance with a statewide standard, the Board may establish an interim standard which, though not impossible to satisfy, is beyond the polluter's present technical capability. In short, it is not necessarily arbitrary and capricious conduct for the Board to set a standard which a petitioner cannot adhere to at the present time, or, if absolutely necessary to protect the public, set a standard with which there can be no foreseeable compliance by petitioner. In the case at bar, then, even assuming Monsanto is correct in arguing that nothing in its past discharge figures indicates an ability to comply with the six-month limit set by the Board, we cannot say that this possible inability requires us to reverse the Board's action. After considering the high toxicity of the contaminant in question, and the fact that the .2 figure is five times the statewide standard, we conclude that the Board's action was justified by a due regard for the public health, and was not arbitrary, capricious, or unreasonable.

Finally, Monsanto asserts that the interim discharge limits set by the Board are arbitrary and capricious because a substantial portion of the mercury discharged by Monsanto into the Sauget sewer system originates in the environment and so *cannot* be controlled by Monsanto and, in any case, *need not* be so controlled because it is not a result of Monsanto discharges. Monsanto alleges that various tests it has conducted indicate that more than half of the mercury appearing in Monsanto's most recent discharge levels (.1504 pounds per day) is attributable to mercury contained in the rainfall which falls on the plant area and is discharged through Monsanto's sewers. The Board responds, first of all, that the data Monsanto offers are far too limited to form the basis of any educated conclusion about the amount of mercury discharge which

comes from the environment. More significantly, it is possible to conclude that the Krummrich plant is actually the source of whatever mercury does exist in the area's rainfall. Monsanto "loses" more than 32,000 pounds of mercury a year. Using Monsanto's own figures, 1,800 pounds of that cannot be accounted for by spills, sludge, or theft. This 1,800 pounds may be atmospheric loss; that is, mercury in the chlor-alkali facility which vaporizes and is discharged into the atmosphere. This mercury settles in the air, and some of it may be washed into Monsanto's sewer system by rainfall. In fact, the amount of mercury "lost" to the atmosphere is 33 times the amount which Monsanto's tests indicate enters the sewer system as a result of rainfall. Therefore, it was reasonable for the Board to conclude that the .1504 pounds per day not imputable to effluent discharges from the chlor-alkali facility, assuming *arguendo* that that is a correct figure, was nonetheless the responsibility of Monsanto. Monsanto counters by reminding us that it is meeting all atmospheric emission standards. This being so, Monsanto reasons that the amount of mercury it discharges into the air cannot be indirectly controlled through the use of water-control standards. With this we cannot agree. The actions of the Board were not aimed at forcing Monsanto to reduce its atmospheric emissions, since they are already within legal limits. The Board's requirements were addressed exclusively to aquatic pollution; it set limits on the amount of mercury whose discharge into the Sauget sewer system could be tolerated. It was the task of Monsanto to meet these limits by reducing whatever discharges contributed to violation of the Board's order.

Finally, Monsanto is in error in assuming that it will be excused from the task of meeting Board requirements if it can show that it is not responsible for a substantial amount of mercury discharged from its plant into the sewer system, but rather that this mercury is a result of

environmental factors. Even if Monsanto had shown that some of the mercury in question appears from other sources and not as a result of any of its discharges, atmospheric or aquatic, it does not follow that Monsanto would be absolved from regulating the total discharge of mercury so as to satisfy the Board's standards. Although only .1 pound of mercury per day is discharged from Monsanto's chlor-alkali facility, which occupies only a small part of the total plant area, the average discharge from the total plant is .25 pounds of mercury per day. In fulfilling its mandate to safeguard the public health, the Board can deny a variance, or, as in this case, set stringent conditions upon a variance, when it is necessary to do so to limit the total amount of a contaminant discharged by Monsanto's plant *from whatever source,* to levels which do not threaten the public welfare. The hardship this causes an individual petitioner is never a justification for endangering public safety.

We conclude that the appellate court erred in reversing the decision of the Board and in holding that the Board had the authority to grant variances in excess of one year. We therefore reverse the judgment of the appellate court and reinstate the decision of the Pollution Control Board.

*Appellate court reversed;*
*Pollution Control Board affirmed.*