STATES LAND IMPROVEMENT CORPORATION, Plaintiff-Appellant, v. THE ENVIRONMENTAL PROTECTION AGENCY, Defendant-Appellee.

Fourth District   No. 4—91—0365

Opinion filed June 25, 1992.

STEIGMANN, J., specially concurring.

James I. Rubin and Kevin J. O'Brien, both of Butler, Rubin, Newcomer, Saltarelli, Boyd & Krasnow, of Chicago, and Frederick C. Prillaman, of Mohan, Alewelt, Prillaman & Adami, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and John A. Morrissey, Assistant Attorney General, of Chicago, of counsel), for appellee.

Katherine D. Hodge, of Hodge & Dwyer, of Springfield, for *amicus curiae*.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On May 23, 1990, plaintiff States Land Improvement Corporation (States Land) filed suit for issuance of a common law writ of *certiorari* in the circuit court of Sangamon County against defendant Illinois Environmental Protection Agency (IEPA) thereby challenging an action by IEPA which placed a closed landfill site owned by States Land on IEPA's "State Remedial Action Priorities List" (SRAPL). (See 35 Ill. Adm. Code §860.210, at 3100 (group 4) (1991).) On May 1, 1991, the circuit court allowed the IEPA's motion to dismiss in bar of action. States Land has appealed. We reverse and remand with directions.

■ Both parties recognize that a common law writ of *certiorari* is an available means of judicial review of final decisions of agencies exercising quasi-judicial functions, if the agency's enabling statute does not expressly adopt the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*) as a means of judicial review. (*Smith v. Department of Public Aid* (1977), 67 Ill. 2d 529, 367 N.E.2d 1286; *City of Wood Dale v. Illinois State Labor Relations Board* (1988), 166 Ill. App. 3d 881, 520 N.E.2d 1097.) The Environmental

Protection Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 1001 *et seq.*), under which the IEPA purported to act in providing for the SRAPL, makes no provision for judicial review of an order such as that on review here.

Although the question is a close one, we hold that in placing States Land's property on the SRAPL, the IEPA was performing a quasi-judicial function which had sufficient finality to make it subject to judicial review by common law *certiorari*. We also hold that IEPA lacked the power to create the SRAPL, at least in the manner in which it was done, under its statutory powers and its past and current rules.

The IEPA contends its action in placing States Land's sites on the SRAPL was a legislative or executive function and not a quasi-judicial function subject to judicial review by common law *certiorari* and, moreover, even if its action was subject to such review, its action was proper and authorized by its valid regulations. The circuit court held the action was not quasi-judicial in nature and the common law *certiorari* did not lie, and therefore did not pass upon the propriety of the action by the IEPA.

The IEPA asserts that the SRAPL is authorized by regulations enacted by it pursuant to provisions of the Act. These regulations are found in the Illinois Administrative Code (Code) (see 35 Ill. Adm. Code (Code), §§860.100 through 860.300 (1991)). Section 860.100 thereof provided as follows:

"a) The purpose of the State Remedial Action Priorities List (SRAPL) is primarily to serve as an informational tool for use by the Agency in identifying sites that appear to present a significant risk to public health, welfare or the environment.

b) The initial identification of a site on a SRAPL is intended primarily to guide the Agency in determining which sites warrant further investigations designed to assess the nature and extent of the public health and environmental risks associated with the site and determine what State-financed remedial action, if any, may be appropriate.

c) Inclusion of a site on the SRAPL does not establish that the Agency necessarily will undertake remedial action at the site.

d) The listing of a site on the SRAPL does not require any action of any private party, nor does it determine the liability of any party for the cost of the clean-up of the site." 35 Ill. Adm. Code §860.100, at 1091 (1986 Supp.).

Section 860.130 provided that new sites are added, if necessary, to the existing SRAPL by annually amending title 35, section 860.210 (35 Ill. Adm. Code §860.210 (1986 Supp.)) of the Code, which contains the actual list of sites, if there are sites that meet the criteria of section 860.200 (35 Ill. Adm. Code §860.200 (1986 Supp.)). (35 Ill. Adm. Code §860.130, at 1092 (1986 Supp.).) Section 860.200 of the IEPA's rules provided as follows:

"a) Except as provided in paragraph (b), the Agency shall list on the SRAPL those sites which:

1) Are eligible under 35 Adm. Code 750 or Section 22.2 of the Act for listing on the SRAPL; and

2) Score greater than or equal to 10.0, but less than 28.5, using the federal Hazard Ranking System (HRS) (40 CFR 300, Appendix A, as such rule existed on July 19, 1985, and does not include any later amendments).

b) The Agency shall not list a site on the SRAPL if the Agency determines, through site evaluation, that there is no release or substantial threat of a release into the environment of any hazardous substance, or any pollutant or contaminant which may present an imminent or substantial danger to public health or welfare." 35 Ill. Adm. Code §860.200, at 1092 (1986 Supp.).

Section 860.300 of the IEPA's rules further states:

"The Agency shall delete a site from the SRAPL if the Agency determines, through site evaluation, that there is no release or substantial threat of a release into the environment of any hazardous substance, or any pollutant or contaminant which may present an imminent or substantial danger to public health or welfare." 35 Ill. Adm. Code §860.300, at 1093 (1986 Supp.).

These rules were adopted by the IEPA in 1985 under the statutory authority of sections 4 and 22.2(a) (Ill. Rev. Stat. 1983, ch. 111½, par. 1022.2(d)) (9 Ill. Reg. 12276 (eff. July 24, 1985)), and the SRAPL—section 860.210 of IEPA's rules—has since been revised (amended at 10 Ill. Reg. 4226, 4230 (eff. February 26, 1986); amended at 11 Ill. Reg. 12232, 12236-37 (eff. July 9, 1987); amended at 12 Ill. Reg. 16074, 16076-77 (eff. September 23, 1988); amended at 14 Ill. Reg. 5776, 5778-79 (eff. April 9, 1990) (adding States Land Improvement site No. 1, among others)).

On October 17, 1989, the IEPA sent a letter to the president of States Land notifying him, "As a potential responsible party" of States Land, that its site No. 1 was listed as an amendment to the proposed SRAPL, which was going to be published in the Illinois Reg-

ister on October 20, 1989 (see 13 Ill. Reg. 16252 (proposed October 20, 1989)). The letter stated "the purpose of the SRAPL is primarily to serve as an informational tool for use by the Agency in identifying sites that appear to present a significant risk to public health, welfare or the environment." The IEPA's letter included a notice of proposed amendments which showed site No. 1 as an amendment to SRAPL. (See 13 Ill. Reg. 16252, 16255-56 (proposed October 20, 1989).) The notice invited written comment to be submitted to the IEPA within 45 days after receiving notice.

States Land submitted written comments to the IEPA's notice of proposed amendment, denying site No. 1 released or posed a substantial threat of releasing hazardous substances into the environment. These comments were included in the IEPA's written evaluation of all comments on the proposed rule during the first notice period, as well as the IEPA's responses to States Land's comments. On April 17, 1990, the IEPA sent another letter to the president of States Land notifying him that site No. 1 was listed on SRAPL, and an amended final rule would be published in the Illinois Register on April 20, 1990. See 14 Ill. Reg. 5776, 5780 (eff. April 20, 1990).

The case of *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684, concerned judicial review of a variance granted by the Pollution Control Board (PCB). The question of the requirements for issuance of a common law writ of *certiorari* was not involved. However, in determining the proper standard of review, the question arose as to whether the PCB's actions were rulemaking or quasi-judicial in nature. The supreme court concluded the decision as to whether to grant a variance was essentially quasi-judicial, involving specific findings of fact, but the setting of conditions on the variance involved rulemaking. The determination of conditions was described as "one manifestation of the power granted the Board to act as the policy-making body" and rulemaking, "in the sense that its focus is on future conduct and its efficacy depends upon agency expertise." *Monsanto*, 67 Ill. 2d at 290, 367 N.E.2d at 689.

In maintaining the listing of sites on the SRAPL is not quasi-judicial action, the IEPA points out that inclusion of a site therein "does not mandate state-financial remedial action for that site nor does it require any private action by the site owner. 35 Ill. Admin. Code §860.100(c), (d) (1986 Supp)." Rather, the IEPA maintains that the SRAPL supplies information to it and establishes its practices for dealing with hazardous waste. Because the SRAPL is keyed to possible future action by the IEPA, it maintains the listing of the sites is more analogous to rulemaking than to making a quasi-judicial deci-

sion. We also note that because no remedial action necessarily accompanies the placement of a site on the SRAPL, the placement lacks the finality ordinarily necessary for judicial review of agency action. See *City of Quincy v. Carlson* (1987), 163 Ill. App. 3d 1049, 517 N.E.2d 33.

In addition to its discussion of quasi-judicial activity of administrative agencies in *Monsanto,* the supreme court also touched upon the subject in *In re Proposed Incorporation of Liberty Lakes* (1988), 119 Ill. 2d 179, 518 N.E.2d 132, while determining that the General Assembly had not unlawfully delegated judicial power in creating a particular method of incorporating a village. The court stated that action by a county board which "calls for the application of law to a set of particular facts" is a "classic adjudicative function." (*Liberty Lakes,* 119 Ill. 2d at 183, 518 N.E.2d at 134.) Here, the placement of a site on a SRAPL calls for the application of the Act to the facts surrounding a particular site. The procedure used had other adjudicatory aspects in that States Land was given notice by the IEPA and was afforded an opportunity to be heard by written response to the proposed action. Following the *Monsanto* distinction between quasi-judicial conduct and policy or rulemaking, the IEPA's determination of the factual situation at the site was more like ruling on whether a variance should be granted (and thus quasi-judicial) than deciding about the conditions of a variance (which would be policy making).

As the IEPA points out, any damage to States Land, if the listing is wrong, is indirect, as States Land is neither required to take any action in regard to the site nor prohibited from making any use of the site because of its listing on the SRAPL. Rather, the damage would be to the reputation of the site, the ability of States Land to sell or rent it or surrounding land, and the ability to obtain financing in regard to those properties. The problems confronted by site owners are compounded because, as the parties agree, the IEPA purposefully gives wide publicity to the SRAPL.

■ We are reluctant to hold that agency action which has interlocutory aspects and which, if in error, does not cause direct damage is subject to judicial review. (See *City of Quincy,* 163 Ill. App. 3d at 1053, 1056, 517 N.E.2d at 35, 37 (actual controversy requirement not met in challenge to application of statutory notice of potential liability for release of hazardous substances in violation of Act).) However, placement of a site on the SRAPL is a legal determination of its status. While section 860.300 of IEPA's rules directs the agency to remove a site from the SRAPL when substantial threat of release of hazardous substance from that site no longer exists, we are unaware

of any regulation which gives a site owner a procedure whereby it can prove the site is no longer such a threat. Thus, the action of placing a site on the SRAPL has strong elements of permanence and finality from which judicial review must be granted.

Both sides call our attention to *City of Wood Dale* (166 Ill. App. 3d 881, 520 N.E.2d 1097), where a party sought to review by common law *certiorari* a labor board action certifying a group as an appropriate unit for representation. This court held the writ should not issue, pointing out that the legislation involved envisioned that ultimate review was obtainable in proceeding before the labor board, if a losing party raised the issue by defying the ruling and committing an unfair labor practice. The decision did not involve the question of whether an action was quasi-judicial.

For the stated reasons, we hold that the act of the IEPA in putting a site on a SRAPL is a quasi-judicial act subject to judicial review. As no provision is made in the Act for such review, common law *certiorari* is the appropriate remedy.

We thus come to the question of whether the action of placing site No. 1 on the SRAPL was improper because the regulations upon which the SRAPL was based were beyond the power of the IEPA. This issue was not passed upon by the circuit court as it determined the close question as to whether *certiorari* was an appropriate remedy in favor of the IEPA. We could remand the cause back to the circuit court for its decision on that question, but conclude that judicial economy dictates we now decide the matter.

■ Nothing in the Act expressly authorizes the IEPA to make the regulations we have shown which purport to provide for the SRAPL. Section 4(s) of the Act authorizes the IEPA "to take whatever preventive or corrective action is necessary or appropriate *** for removal or remedial action, whenever any hazardous substance or pesticide is released or there is a substantial threat of such a release into the environment." (Ill. Rev. Stat. 1989, ch. 111½, par. 1004(s).) Section 4(u) of the Act authorizes the agency to adopt regulations necessary to impose administrative citations against operators of landfills. (Ill. Rev. Stat. 1989, ch. 111½, par. 1004(u).) Section 2(b) of the Act states a legislative intent "to establish a unified, statewide program *** to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." (Ill. Rev. Stat. 1989, ch. 111½, par. 1002(b).) Section 22.2(d) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.2(d)) authorizes IEPA to deposit 90% of receipts of certain fees collected to the credit of the Hazardous

Waste Fund and provides for expenditure of those funds but does not provide for the procedure about which States Land complains here.

We recognize the general rule that "[w]here there is an express grant of authority there is likewise a clear and express grant of power to do all that is reasonably necessary to execute the power or perform duties specifically conferred by the enabling statute." (*Illinois Federation of Teachers v. Board of Trustees* (1989), 191 Ill. App. 3d 769, 774, 548 N.E.2d 64, 66-67.) Here, however, we are unwilling to infer from the rulings or statutory language we have quoted that the IEPA has the implied power to enact the regulations creating the SRAPL which impose such dire consequences upon a site owner without opportunity to be heard as to when the site must be removed from the SRAPL.

Accordingly, we reverse the judgment of the circuit court and remand the cause to the circuit court with directions to issue the writ of *certiorari* and to enter an order declaring the regulations purporting to authorize the SRAPL void and directing that States Land be expunged from the SRAPL.

Reversed and remanded with directions.

COOK, J., concurs.

JUSTICE STEIGMANN, specially concurring:

My views on this case can best be explained by presenting the following *imaginary* newspaper article. (Note—I apologize in advance to the personnel of the Illinois Department of Revenue, but some agency had to be selected in order to make the points that follow.)

"SPRINGFIELD—Paul Bunyan Builder Supplies, Inc., a wholesale and retail lumber and builder supplies company with nine stores located throughout Illinois and revenues exceeding several million dollars annually, filed suit today in Sangamon County Circuit Court against the Illinois Department of Revenue. Bunyan alleged in its suit that the Department had unfairly and improperly placed Bunyan on the Department's Let's-Be-Sure-To-Investigate-This-Case-When-We-Can-Get-Around-To-It List, commonly known as the LEISURE List, and that this placement seriously hurt Bunyan's business.

The Department's public relations officer explained that departmental regulations authorized the creation of the LEISURE List, whose purpose 'is primarily to serve as an informational tool for use by the Department to identify taxpayers who

appear to present a significant risk of having misstated or underpaid their State tax.'

The Department's spokesman further explained that the initial identification of a taxpayer on the LEISURE List 'is intended primarily to guide the department in determining which taxpayers warrant further investigation designed to assess if in fact those taxpayers have misstated or underpaid their State tax, and, if they have, the extent to which they have done so.'

The spokesman added that inclusion of a taxpayer on the LEISURE List also assisted the Department in determining what remedial action would be appropriate if the Department were to find that the taxpayer had misstated or underpaid his State tax.

Bunyan claims that its inclusion on the LEISURE List could bankrupt it because potential lenders and customers will view such inclusion as proof that Bunyan engages in questionable business practices. In addition, Bunyan alleges that the possibility the Department might impose tax liens upon its assets has already seriously affected its ability to do business on a day-to-day basis. As an example, Bunyan points out that one of Illinois' largest banks has terminated the half-million dollar line of credit that Bunyan had enjoyed for over 15 years. Further, some of Bunyan's material suppliers now ask for payment up front to avoid possible litigation with the Department over tax liens.

Asked to comment on these claims, the Department's spokesman pointed out that Bunyan's inclusion on the List does not require it to take any action nor prohibit it from continuing with 'business as usual.' The spokesman sniffed that any alleged harm to Bunyan is indirect and none of the Department's doing, although the spokesman conceded that the Department 'purposefully gives wide publicity to the LEISURE List.'

When asked why the Department publicized the LEISURE List, the spokesman explained that the public is 'rightly concerned about tax scofflaws' and needs assurance that the Department is checking into cases like Bunyan's, where the Department has received credible tips that a taxpayer may have misstated or underpaid his State taxes.

The spokesman conceded that prior to Bunyan's placement on the LEISURE List, Bunyan was given an opportunity to respond to these allegations and vigorously disputed all of them. However, the spokesman stated, 'that response is to be ex-

pected.' The spokesman added that to be totally fair to Bunyan, the Department included Bunyan's response as appendix H3/2Y(b) to regulation 91-7(3).G95j, thereby making the response easily available for anyone who might wish to read it.

The spokesman added that the Department found that creating and publishing the LEISURE List more efficiently communicated departmental interests and concerns throughout the State to Department employees and investigators than using old-fashioned means of communication, such as interoffice memos, fax messages, or telephone calls. The spokesman stated, 'This way not only can we get our message to all our employees, but the public can see how hard we are working as well.'

When asked if Bunyan or any other taxpayer placed on the LEISURE List could do anything to remove its name therefrom and whether the Department had any limit on how long a taxpayer's name could remain on the List without further action being taken by the Department, the spokesman explained that there was nothing a taxpayer could do to force the Department to remove its name from the LEISURE List. He added that he viewed the Bunyan lawsuit as a frivolous attempt to get the circuit court improperly involved in overseeing the Department's internal procedures.

As to how long a taxpayer might remain on the LEISURE List, the spokesman emphasized that no taxpayer will remain on the List 'any longer than necessary.' He explained that 'just as soon as we can get around to fully investigating a case such as Bunyan's to determine whether to file any civil or criminal charges, you can be assured that we will do so.' 'In the meantime,' he oozed, 'Trust us—we're from the government and we're here to help.' "

Upon reading the above imaginary newspaper article, one would be tempted to think it a parody of modern bureaucratic doublethink. Unfortunately, that is not true. Instead, the case before this court proves the old saw that the work of the modern satirist has become increasingly difficult because no matter how hard the satirist tries, real world events are fully as ridiculous as any the satirist can envision.

Although I have changed the names in my hypothetical newspaper story from the IEPA to the Department of Revenue (to protect the guilty), this hypothetical story fully applies to the present case, and the position of States Land is fully equivalent to that of the hypotheti-

cal Paul Bunyan Builder Supplies. I used the device of the hypothetical newspaper article in order to best convey to the reader the full extent of the outrageous conduct in which the IEPA has engaged in this case.

At oral argument, counsel for the IEPA argued that the agency needs SRAPL to enable it to determine how to expend its limited investigative resources and to receive citizen input in the process. However, despite repeated requests from the bench, counsel could not explain why those goals, to the extent that they are desirable and appropriate, could not be achieved without SRAPL, just as the *hundreds* of investigative, policing, and prosecutorial departments or agencies operating in Illinois routinely achieve those same goals.

The record shows that the IEPA has *in effect* found States Land guilty of violating the Act and might very well choose to let the matter lie forever in its current state of limbo, thereby denying States Land any semblance of due process. The regulation at issue and the IEPA's utilization of it in this case are truly right out of the novels of Franz Kafka.

By these remarks, I do not intend to give comfort to polluters nor to deprive the IEPA of its statutory duty to investigate any complaints it receives about polluters. (See Ill. Rev. Stat. 1989, ch. 111½, par. 1030.) I only ask that the agency behave responsibly, just as every other investigative and prosecutorial agency is required to behave, as it investigates allegations of misconduct.

One of the hallmarks of prosecutorial discretion is confidentiality. Sometimes, despite the best efforts of investigators, an investigation into allegations of misconduct becomes public. On other occasions, leaks regrettably occur from the police, prosecutor's offices, or grand juries about ongoing investigations. However, such leaks are the exception to the rule, and the behavior of prosecutors during the investigative stage is subject to ethical restraints. See Standards for Criminal Justice §§3—1.1 through 3—6.2 (1986).

What I find so shocking about the IEPA's promulgation and utilization of SRAPL in this case is that it constitutes nothing less than institutionalizing prosecutorial abuse.

I concur fully in the majority opinion.