MARATHON OIL COMPANY, Appellant, v. THE ENVIRONMENTAL PROTECTION AGENCY *et al.*, Appellees.

Fifth District No. 5—92—0147

Opinion filed March 23, 1993.

Joseph S. Wright, Jr., and Mark J. Steger, both of McBride, Baker & Coles, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE LEWIS delivered the opinion of the court:

Marathon Oil Company (Marathon) appeals a decision by the Illinois Pollution Control Board (Board) which denied Marathon's September 17, 1991, petition for a variance. The petition sought a variance from certain water quality standards imposed by the Illinois Environmental Protection Act (Act) (Ill. Rev. Stat. 1991, ch. 111½, par. 1001 *et seq.* (now 415 ILCS 5/1 *et seq.* (West 1992))). After conducting an evidentiary hearing, the Board denied the relief sought. Marathon appeals the Board's decision pursuant to the provisions of section 41 of the Act. (Ill. Rev. Stat. 1991, ch. 111½, par. 1041 (now 415 ILCS 5/41 (West 1992)).) For reasons more fully set forth below, we reverse and remand.

On appeal, Marathon contends that the Board wrongly denied its request for a variance, arguing that it presented sufficient evidence to demonstrate a need for the variance and that no environmental harm will result if the variance is granted. We must consider, therefore, the issue of whether the Board's denial of the variance was contrary to the manifest weight of the evidence. *File v. D & L Landfill, Inc.* (1991), 219 Ill. App. 3d 897, 579 N.E.2d 1228.

Marathon owns and operates a refinery just outside Robinson, Illinois, that processes petroleum crude oil into fuel and other products. A part of the refinery process includes a wastewater treatment plant which has been updated several times and which currently meets modern effluent limits for the discharge of pollutants into the water. Marathon discharges its wastewater into an unnamed tributary of Sugar Creek approximately 14 miles upstream of Sugar Creek's confluence with the Wabash River.

The petition for variance filed by Marathon requested an increase in the limit currently imposed upon the plant for its discharge of chloride, a by-product of the processing of crude oil into refined products. Current rules prohibit Marathon from discharging more than 700 milligrams of chloride per liter of effluent from its primary discharge outlet. Additionally, the rule requires that the stream into which Marathon discharges not contain more than 550 milligrams of chloride per liter. These regulations are imposed via a site-specific rule change promulgated by the Board in 1989. (*In re Marathon Petroleum Co.* (1989), ___ Ill. PCB Op. ___; 35 Ill. Adm. Code §303.323 (1992).) (Marathon Oil Company, the petitioner in this case, is the successor of Marathon Petroleum Company.) **Marathon's** petition requests an interim variance raising the chlo-

ride level from 700 to 1,000 milligrams per liter for effluent discharges and from 550 to 750 milligrams per liter for the stream itself. Marathon also has pending a petition for a site-specific rule change, which, if granted, will give Marathon the same relief on a permanent basis; however, that petition is not involved in this appeal.

In response to Marathon's petition for variance, the Illinois Environmental Protection Agency (Agency) filed a recommendation, pursuant to the requirement of section 37 of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1037 (now 415 ILCS 5/37 (West 1992))), recommending that the request for variance be denied on the ground that Marathon had failed to meet its burden of demonstrating an arbitrary and unreasonable hardship, as required by the Act. (Ill. Rev. Stat. 1991, ch. 111½, par. 1035 (now 415 ILCS 5/35 (West 1992)).) The recommendation stated that Marathon had not violated the regulation for chloride effluent in the past year. Regarding environmental impact, the recommendation cited an October 1, 1991, field study conducted by the Agency documenting that the stream into which Marathon discharges was virtually devoid of fish below the Marathon effluent, but that a population of small species other than fish still exists. The stream shows improvement in the fish population farther downstream when compared to a survey conducted in 1986, in that approximately four miles of stream previously devoid of fish now support several species. The recommendation concluded: "[the] causative factor for the degraded stream conditions directly downstream of Marathon and the apparent adverse effect of Marathon's effluent on the stream is unknown. Nevertheless, it is not reasonable to grant the Petitioner's variance request without both further hardship documentation and assurance that additional chlorides in the stream will not further degrade the stream." The Agency contends that Marathon has not shown that compliance with the current rules constitutes an arbitrary and unreasonable hardship. The Agency asserts that Marathon has nearly exceeded the chloride limit, but that Marathon has not *actually* violated the limit. Thus, the Agency argues, Marathon has failed to sustain its burden of proof.

An evidentiary hearing was held before the Pollution Control Board. The only evidence presented by Marathon at the hearing was the expert witness testimony of Robert C. Wallace, a program manager for an environmental consulting firm working for Marathon. He testified that Marathon's Robinson plant is situated at the headwaters of the unnamed tributary of Sugar Creek into which it

discharges its wastewater. Before reaching Marathon, the stream runs for only eight miles. In 1988, the Agency estimated that the discharge upstream from Marathon, primarily deriving from Briggs Manufacturing and the City of Robinson's sewage treatment plant in addition to discharges from other recreational and agricultural sources, was approximately equal to Marathon's discharge. Marathon discharges approximately 1.4 million gallons per day, but this amount fluctuates greatly on a daily basis.

At the time of the hearing, Marathon was in the process of upgrading its wastewater treatment plant, to increase its capacity to approximately 4.5 million gallons per day and to improve its ability to handle periods of peak water-storage needs. The new facility was supposed to be operational by 1992, but this court has no evidence of whether or not the new facility is currently operational. The new treatment facility will provide some marginal increase in the plant's ability to manage high-chloride wastewater but is not designed with any new technology for the removal of chlorides.

In 1985, Marathon considered alternate methods of controlling the chloride discharge from the Marathon plant. Although three alternate methods of treatment and disposal were considered feasible, none were found to benefit the environment of the stream sufficiently to justify the cost. None of the alternate methods were found to decrease the amount of chlorides Marathon discharges into the stream. In 1989, the Board concluded that Marathon has no viable alternatives to its current chloride-management system. *In re Marathon Petroleum Co.* (1989), ___ Ill. PCB Op. ___; 35 Ill. Adm. Code §303.323 (1992).

In addition to the 1989 site-specific rule change, Marathon is also subject to a 1985 Board-approved settlement agreement with the Agency. This agreement requires Marathon to divert clean storm water away from the wastewater treatment plant and directly into the stream. The reason for the diversion is to increase treatment capacity. However, the diversion process results in less clean water being available to dilute the chlorides before they are discharged into the stream and in longer storage of the high-chloride water before it can be discharged into the stream.

The level of chlorides in the crude oil received by the plant fluctuates daily and has been increasing steadily since 1988. Marathon has no control over the level of chlorides in the crude, because the chlorides are added during the extraction and transportation of the crude by the sellers, over which Marathon has no authority. Additionally, the level of chlorides in the crude is not a factor that is

specified by the sellers, so that Marathon does not know the percentage of chloride contained in the crude before it is purchased.

When Marathon processes crude oil that is high in chloride content over a relatively long period, it must use most of its storm-water retention facilities to store the chlorides before they can be discharged in small amounts that will not exceed the 700-milligram-per-liter limit. The problem with this chloride-management system is that it does not allow for storage of large amounts of high-chloride wastewater at the same time that the area is having heavy rain or other storm activity.

When both events occur simultaneously, Marathon is forced into an emergency bypass system. When this happens, rainwater that has been contaminated by contact with the oil fields of the plant is discharged directly into the stream, because there is nowhere for Marathon to store it. When the emergency bypass system is engaged, Marathon is not in violation of the applicable water-quality standards even though it may have discharged a level of chloride much higher than the currently allowed limit. According to Marathon, approximately 13% of the crude oil Marathon now purchases contains more than enough chloride to cause Marathon to violate the current limits. In the past, when the storage facilities have been filled, only luck has prevented an emergency bypass discharge. Additionally, although Marathon had not violated the chloride limit in the year before the hearing, it did violate those limits several times in the fall of 1990.

Wallace testified that he believes it is "virtually impossible" for Marathon not to violate the current chloride limits in the future. The extraordinary management methods Marathon uses will "inevitably" result in a violation of the chloride limits in the future, even if the expanded treatment plant becomes operational. This violation is especially likely if Marathon increases the amount of crude oil it processes, which Wallace testified it plans to do, and if the chloride content of the crude oil available to Marathon continues to rise, as Wallace predicted it will.

On January 9, 1992, the Board denied Marathon's petition for variance, finding that Marathon did not meet its burden of demonstrating that denial of the variance would amount to an arbitrary or unreasonable hardship to Marathon. In its decision, the Board states that Marathon did not argue that continued compliance with the current chloride limit would be impossible, but only that it would be difficult. The Board found difficulty alone an insufficient basis for granting a variance. The Board's decision specifically did

*not* make any findings regarding the possible environmental impact of granting the variance, due to its finding that Marathon had not demonstrated the requisite proof of arbitrary or unreasonable hardship. Marathon filed a motion for reconsideration, which the Board considered and denied.

■■ On appeal, Marathon argues that the Board's decision amounts to an improper rewrite of the variance statute. That statute provides, in pertinent part, as follows:

> "The Board may grant individual variances beyond the limitations prescribed in this Act, whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship." (Ill. Rev. Stat. 1991, ch. 111½, par. 1035(a) (now 415 ILCS 5/35(a) (West 1992)).)

Marathon argues that the plain words of the statute do not require that one requesting a variance show that a violation has occurred, but that the Board required a violation as a condition precedent to a variance and, finding none in the year before the hearing, denied the petition solely on that basis.

Marathon argues that the unrefuted proof it presented at the hearing did amount to a showing that denial of the variance would impose an arbitrary or unreasonable hardship on Marathon. It cites Wallace's testimony, wherein he stated that continued compliance will be virtually impossible and that the inevitable result of a denial of the variance will be a violation of the chloride limit. Marathon also points out that it presented evidence that the variance they are seeking will not damage the environment. Marathon contends that not only its studies but the Agency's own 1986 study indicate that the level of chloride concentration they need and request will not damage the environment of the stream or endanger any of the species living there.

The Agency argues in response that the Board did not base its decision solely upon the lack of a violation. The Agency contends that the lack of a violation is merely one factor the the Board considered in deciding that Marathon did not need an interim variance. The Agency urges us to find that Marathon did not present sufficient evidence to meet the arbitrary or unreasonable standard required by the statute. It cites the purpose of the Act to be compliance by all polluters with the provisions of the Act. *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684.

We must now consider whether the Board's decision was contrary to the manifest weight of the evidence. The Board's decision

is quasi-judicial, and as such, its findings of fact are presumed to be true and correct. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684.) However, while the reviewing court should not substitute its own judgment or reweigh the evidence, if the factual determinations are contrary to the manifest weight of the evidence, the reviewing court should reverse the Board's decision. *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684.

■ When deciding whether to grant or deny a variance request, the Board is required to balance the hardship of continued compliance on the business against the adverse impact the variance will have on the environment. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684; *Ekco Glaco Corp. v. Environmental Protection Agency* (1989), 186 Ill. App. 3d 141, 542 N.E.2d 147; *Caterpillar Tractor Co. v. Pollution Control Board* (1977), 48 Ill. App. 3d 655, 363 N.E.2d 419.) The party requesting the variance has the burden of establishing that the hardship resulting from a denial of the variance outweighs any injury to the public or the environment from a grant of the variance. (*Caterpillar Tractor Co. v. Pollution Control Board* (1977), 48 Ill. App. 3d 655, 363 N.E.2d 419.) Specifically, if the one requesting the variance demonstrates only that compliance will be difficult, that proof alone is an insufficient basis upon which to grant the variance. The petitioner must go further and show that the hardship it will encounter from the denial of the variance will outweigh any injury to the public or environment from the grant of the variance. Only if the hardship outweighs the injury does the evidence rise to the level of an arbitrary or unreasonable hardship. *City of Geneva v. Environmental Protection Agency* (1990), 109 Ill. PCB Op. 507.

■ In the case at bar, however, the Board specifically did not reach the question of whether or not there was *any* possibility of environmental damage from the grant of the variance. Rather, the Board decided the case solely on the basis that Marathon did not show an arbitrary or unreasonable hardship from past compliance with the rules. We disagree. We find that the evidence presented was "adequate proof" that continued compliance with the current water-quality standards will impose an arbitrary or unreasonable hardship upon Marathon. There are two main reasons why we disagree with the Board and hold that its decision was against the manifest weight of the evidence.

First, the Board based its decision primarily, if not entirely, upon the fact that Marathon had not violated the current chloride

limit in the year before the hearing. However, the words of the statute do not require any past violations of the rules. The statute requires only "adequate proof, that compliance with any rule *** of the Board *would* impose an arbitrary or unreasonable hardship" upon Marathon. (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 111½, par. 1035(a) (now 415 ILCS 5/35(a) (West 1992)).) The reference to hardship is not written in the past tense. The verb *would*, in this context, connotes a future condition, not a past event. Therefore, the words of the statute neither specifically require a past violation nor do they imply such a requirement.

Second, the virtual certainty of a future violation of the Board's rule is a hardship on Marathon. The Board gave no indication that it did not believe the only witness' testimony. In construing that witness' testimony, any fair interpretation would lead one to conclude that Marathon will violate the Board's rule limiting the chloride per liter of discharge. This certainty of a future violation places Marathon in the unenviable position of having to decide whether to (1) violate the Board's rule and suffer possible prosecution and substantial fines and penalties; (2) shut down; or (3) slow the processing of the crude.

We do not know if Marathon's proposed variance will damage the environment, but if we assume *arguendo* that Marathon's evidence that the variance would not damage the environment is true, then the hardship to Marathon becomes more apparent. Marathon could be prosecuted and punished or forced to slow or shut down, costing Marathon, its employees and the economy a monetary loss, even though the proposed discharge would not or could not harm the environment. This hardship placed on Marathon and the public is arbitrary and unreasonable, if granting the variance would not adversely impact the environment.

On the other hand, if you assume *arguendo* that the variance would cause serious harm to the environment, then Marathon needs to know that a violation of the Board's rule will cause it to be prosecuted to the fullest extent of the law. Marathon may then opt to shut down or slow the refinery processing rather than to harm the environment.

This court is under the impression from oral argument and the briefs filed herein that there has been a tacit signal sent by the Board, the Agency and the office of the Attorney General to Marathon that violation of the limits set by the Board's rule will not result in prosecution, so that the Board does not have to formally or publicly decide if an increase to 1,000-milligrams-of-chloride-per-

liter discharge into the stream would adversely impact the environment. There may be some good reason for this forbearance, especially since Marathon has a petition pending for a site-specific rule change. This court, of course, cannot be a part of this tactical maneuver, if such exists. We fail to see on the surface of this matter how forbearance to rule or to prosecute a violation helps the public or Marathon. The Board's nonaction makes the hardship on Marathon appear even more arbitrary and unreasonable, because it gives the impression that the Board knows that it has promulgated a rule that is too restrictive.

We do not mean to indicate by our opinion that the Board should, in effect, give advisory opinions to potential polluters or encourage potential polluters to request variances for the sole purpose of testing the Board to see if the Board can be persuaded to ease its rules. We see nothing wrong in the Board establishing a requirement that the petitioner at least make a *prima facie* case that it would suffer an arbitrary and unreasonable hardship by complying with the Board's rule before the Board is required to examine the adverse impact the variance would have on the environment. When, however, the petitioner presents unrefuted evidence that it will violate the Board's rule in conducting or increasing its normal business, a hardship is established requiring the Board to determine if such hardship outweighs any injury to the environment.

We do not, nor should we, decide the issue of whether Marathon's proposed variance will damage the environment. The Board failed to do as the case law instructs; it failed to weigh the hardship on the business against the probable environmental impact. Therefore, we reverse the Board's decision and remand with instructions for the Board to decide if the hardship to Marathon outweighs the environmental impact, if any, of the requested variance.

Reversed and remanded.

WELCH and RARICK, JJ., concur.